NIAGARA FIRE EXTINGUISHER CO. v. HIBBARD.

(Circuit Court of Appeals, Seventh Circuit. April 19, 1910.)

No. 1,640.

1. PATENTS (§ 213*)—LICENSES—TRANSFER BY LICENSEE.
    A corporation which took from another corporation, afterward dissolved, all of its property, contracts, and good will, by a bill of sale which warranted title, and without assuming any of the liabilities of the grantor, was not the legal successor of such grantor and did not succeed to its rights under a contract granting it a license under a patent which by its terms was not assignable without the consent of the patentee.
    [Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 315–320; Dec. Dig. § 213.*]

2. PATENTS (§ 213*)—LICENSE—TRANSFER BY LICENSEE.
    A finding that a patentee had not given his consent to the transfer of a license contract from the licensee to another corporation and was not estopped to deny the validity of such transfer *held* sustained by the evidence.
    [Ed. Note.—For other cases, see Patents, Dec. Dig. § 213.*]

3. PATENTS (§ 311*)—SUIT FOR INFRINGEMENT—ISSUES AND PROOFS.
    A defense of noninfringement pleaded in the answer in an infringement suit is not waived by a further defense of license, but raises an issue of fact under which complainant has the burden of proof, and defendant is not estopped by pleading the license from contesting such issue.
    [Ed. Note.—For other cases, see Patents, Dec. Dig. § 311.*]

4. WORDS AND PHRASES—"RESPONSIBILITY."
    The primary meaning of "responsibility" is the state of being answerable for an obligation. A secondary meaning is the ability to pay.
    [Ed. Note.—For other definitions, see Words and Phrases, vol. 7, p. 6179.]

Appeal from the Circuit Court of the United States for the Eastern Division of the Northern District of Illinois.

Suit in equity by George E. Hibbard against the Niagara Fire Extinguisher Company. Decree for complainant, and defendant appeals. Reversed in part.

George T. Buckingham, for appellant.
C. C. Linthicum and Archibald Cattell, for appellee.

Before GROSSCUP, BAKER, and SEAMAN, Circuit Judges.

BAKER, Circuit Judge. Hibbard sued the company on account of alleged infringement of his patents, Nos. 733,646 and 733,962, for improvements in automatic fire extinguishers.

The defenses pleaded were: First, that the company in fact did not infringe; and, second, that Hibbard was barred from charging infringement because (a) the company by succession was entitled to the benefits of a license contract between its predecessor and Hibbard, (b) by an express consent in writing as provided for in said license contract Hibbard had confirmed the assignment thereof to this company, and (c) with full knowledge that this company was carrying on all the business and executing all the contracts of the other company which

had been dissolved Hibbard had accepted from this company and retained the stipulated pay for royalties and services.

A cross-bill, counting on the matters stated as the second defense, and alleging that Hibbard was about to use the patents in defiance of the company's rights, prayed for an injunction against Hibbard. At a hearing on affidavits a temporary restraining order was issued on the cross-bill. These affidavits, by agreement of counsel, were in evidence at the hearing on the merits.

By the decree the restraining order was dissolved, the cross-bill was dismissed for want of equity, and on the bill the company was perpetually enjoined and ordered to account.

Hibbard's license contract was with Niagara Fire Extinguisher Company, a corporation organized under the laws of West Virginia and having its plant and main office at Akron, Ohio. The contract, among other things, provided that the West Virginia corporation for 10 years from February 1, 1901, should have the exclusive right to make, use, and sell automatic sprinkler devices under all patents then owned or thereafter obtained by Hibbard; that Hibbard should be paid $2,000 a year as royalties; that Hibbard should be chief engineer in charge of the corporation's engineering department and should give his best skill and ability to devising and perfecting automatic extinguishing devices for the use of the corporation, at a salary of $2,500 a year; that as soon as Hibbard should have perfected certain named new devices the corporation at its expense should send Hibbard to Europe to sell European rights, the net proceeds of sale to be equally divided; and that the corporation should not assign the contract without Hibbard's written consent.

Regarding the cross-bill and the second defense:

(a) The present company, Niagara Fire Extinguisher Company, was organized under the laws of Ohio in May, 1907. By a bill of sale, July 12, 1908, the West Virginia corporation conveyed all its property, contracts, good will, to the Ohio corporation. According to the terms of this bill of sale the grantee neither assumed, nor took the property subject to, the liabilities of the grantor; but the grantor warranted that it would defend the property against all lawful claims and demands whatsoever. Stockholders and officers were substantially the same. Proceedings from July 15 to October 12, 1908, dissolved the West Virginia corporation.

The Ohio Company was not the successor (or heir) of the West Virginia company. Dillingham v. Snow, 5 Mass. 554; Overseers of the Poor v. Sears, 39 Mass. 122. Hibbard's contract, being personal, could not pass to the Ohio company save by assignment, and the assignment could not be effective without Hibbard's consent. Hapgood v. Hewitt, 119 U. S. 226, 7 Sup. Ct. 193, 30 L. Ed. 369; Boston Ice Co. v. Potter, 123 Mass. 28; Bowers v. Lake Superior Co., 149 Fed. 983, 79 C. C. A. 493.

(b) On August 7, 1908, Allen, the company's general manager wrote from Akron to Hibbard at Chicago:

"I wish to transfer our charter from West Virginia to Ohio (to save taxes). I would like to have you sign the inclosed paper."

The paper was a form for Hibbard's consent to the assignment. It contained no agreement that the Ohio company should be responsible (answerable) to Hibbard for the West Virginia company's past conduct under its covenants. Hibbard wrote to Allen on August 8th:

"I infer that you mean that I should agree that the West Virginia company should assign or transfer my contract to the Ohio company. Now I will be pleased to do so upon receiving a letter from you that this new company is identically the same company, having the same stockholders, and the same responsibility that the old company gives to me."

Allen replied, August 10th:

"The stockholders are exactly the same. We are simply making the transfer from one state to another to save expense."

Hibbard to Allen, August 12th:

"It appears the old company goes out of existence and the Ohio company takes its place. To make the contract binding on the new company, it must by its president and secretary accept the assignment of the contract and guarantee to be bound by and to carry out all its conditions. As there is a lot of dead wood in the old contract, will it not be better to make a new contract? It appears to me that this would be the proper thing to do, so that all old matters will be amicably settled."

No answer. Hibbard to Allen, August 19th:

"I wrote you last week expressing my willingness under proper conditions to allow the company to assign my contract to the new company. I have not heard a word from you since."

No answer. Hibbard to Allen, October 9th:

"I am sorry that you got out of town (Chicago) before I saw you as I wished to have the matter of the new company and myself settled and off my mind You of course understand that I do not agree to the old company's assigning my contract with them to the new company without the new company's making definite arrangements with me as to their responsibility, etc., as I indicated to you in the first instance: and if the new company simply wish to assume the responsibilities of the old company without any changes as suggested, I wish to have that definitely arranged for. Also-that my signature has to be secured before the same can be done, as per our contract."

No answer. On January 27, 1909, Hibbard sent a registered letter to the company itself. After reciting the foregoing correspondence, he proceeded:

"Within the last few days I have heard in the office of the company in Chicago that the West Virginia company has surrendered its charter and gone out of business, and that the Ohio company is manufacturing my devices without any contract with or license from me. On inquiry I find the West Virginia company did actually surrender its charter and was formally dissolved on October 12, 1908, and that the Ohio corporation was chartered May, 2, 1907. Under these circumstances I request that you at once officially inform me of the exact condition of affairs upon all of these points and what has been and is being done and by whom in the manufacture and use of my devices."

On February 1st Allen answered:

"You are right, this matter should be attended to at once. The only excuse is that I have not found time to go over the old contract. I am having the necessary papers prepared today. I expect to be in Chicago by the middle of this week and will discuss this matter with you while there in person."

On February 2d Hibbard wired and wrote:

"Make no transfer of my contract. I will not recognize any transfer made without my consent in writing, and after an opportunity to examine and consider the transfer and after a satisfactory adjustment of all troubles growing out of the refusal of the old company to perform its contract with me."

Allen to Hibbard, February 4th:

"I inclose the papers I referred to in my recent letter. You are certainly aware that it takes two to make a bargain, and that without your signature no transfer can be made. I expect to be in Chicago Monday, at which time we will discuss this matter fully."

In the proposed form of assignment and consent the Ohio company was to assume nothing but the obligations of the contract "from and after the date of this assignment." Hibbard to the company, March 4th:

"Mr. Allen has again been here and again has gone without taking up with me our affairs. What if anything do you intend to do?"

Allen to Hibbard, March 8th:

"The contract as it stands is perfectly satisfactory to us, and if you have any proposition to make in the way of alterations of the contract, we will be glad to take the matter under advisement and give you an early answer."

Hibbard to the company, March 24th:

"Herewith find two checks, dated Feb. 25 and Mar. 10, payable to my order. You have no right to use any device covered by my patents. In case you do not give me at once satisfactory assurance that you will forthwith cease infringing, I shall take action."

The bill of complaint was filed April 5th.

After Hibbard's peremptory telegram of February 2d forbidding the making of the assignment without his written consent, and Allen's acknowledgment that it takes two to make a bargain (thus impliedly representing that no assignment had been attempted and promising that none would be without Hibbard's written consent), it would seem that it should be a matter of mutual astonishment to the parties to learn that Hibbard on August 10th had given his written consent to an assignment which had been made on July 12th. Such, however, is the company's contention. The argument is that after Hibbard on August 8th expressed his willingness to give his written consent on certain conditions, the company on August 10th fully complied with the conditions, and thus there was "a full meeting of the minds, made in writing, sufficient to create a new contract." More explicitly, that Hibbard's conditions were that the new company should be identically the same company as the old, should have the same stockholders, and should have the "same responsibility that the old company gives to me," and that Allen's reply that "the stockholders are exactly the same; we are simply making the transfer to save expense"—was a complete compliance because if the stockholders were exactly the same the company would be identically the same, and if the assets were all transferred the "responsibility" of the new company would be the same as that of the old. Passing over the fact that Allen's proposal of August 7th was made on the basis of not disclosing what had actually been done, and the fact that there were changes in stockholders, we

848 . 179 FEDERAL REPORTER.

take up the meaning of the word "responsibility" in Hibbard's letter of August 8th.

The meaning should be gathered not only from the context, but also from the relations of the parties at the time. The old company had obtained a license to do business in Illinois and had opened a sales office at Chicago with salesmen in charge. Hibbard thought he was entitled to be in actual charge of the engineering department. The company kept him at a desk in the Chicago sales office, with practically nothing to do. He claimed the right to work in the factory for the purpose of "devising and perfecting automatic extinguishing devices for the use of the corporation." He asserted that he was prevented from doing so. He asked to be sent abroad to sell European rights. He avowed that the company refused. When the foregoing correspondence opened, Hibbard had an action for damages pending against the old company.

The primary meaning of "responsibility" is the state of being answerable for an obligation. A secondary meaning is the ability to pay. From the context, wherein Hibbard was demanding that he have from the new company "the same responsibility that the old company gives to me," and from the relations between the parties, wherein Hibbard was demanding that the old company should account for its conduct under its affirmative covenants, we think it clear that Hibbard intended that the new company should affirmatively assume the liabilities of the old company to him—not merely that the new company should have the financial ability to respond if it were liable to respond. We are inclined to believe that Allen on August 10th must have understood Hibbard's expression. But if there was any ambiguity, Allen should have asked for the clearer definition which Hibbard gratuitously furnished in his letter of August 12th and thence on. Our conclusion is that there was no meeting of the minds, expressed in writing.

(c) Allen's testimony, supported by that of two employés in the Chicago office, was to the effect that he and the others between August, 1908, and February, 1909, had frequently informed Hibbard that the old company had dissolved, that the new company had taken over all the business and contracts, and that the payments of royalties and salary to Hibbard were being made by the new company. Hibbard denied all this. These witnesses testified orally before the chancellor. His estimate of the credibility of the company's witnesses should not be overturned on account of mere numbers. But further, Allen's story is inconsistent with the documentary and other unquestionable evidence in the record.

It is hardly credible that Hibbard would have assumed the attitude he did throughout the correspondence if he knew and knew that Allen knew that the position was false in fact. It is more incredible that Allen over his signature should have repeatedly acquiesced in such an assumption.

Every outward sign indicated that the business was being carried on by the old company. In the Chicago office the license to act as a corporation in Illinois, procured by the old company, was displayed on the wall as long as Hibbard remained. The new company did not

take out an Illinois license until after this suit was started. At Akron no changes were made. No deed of the plant from the old company to the new was put on record. Signs, stationery, books, bank accounts, continued the same.

The alleged estoppel is particularly predicated on Hibbard's retention of a check of February 10th. True, on January 27th Hibbard had written to Allen that within the last few days he had heard in the Chicago office that the old company had surrendered its charter and gone out of business, and that the new company was manufacturing his devices without any license from him. But he made that the reason for demanding that he be informed officially and at once as to the truth of the report. The preceding correspondence had all been conducted on the basis of Allen's representation that the assignment of the contract was a matter of the future. In Allen's letter of February 4th he virtually repeated the representation and assured Hibbard that no transfer would be attempted without his written consent. When Hibbard received and retained the check of February 10th, he had had no letter answering his demand of January 27th. The check itself was upon the form of the old company, bore the name of the old company signed by the same officer, was drawn upon the same bank, and exhibited the number 15,694 in series with former checks. Hibbard's attorneys (having failed to learn by examination of records or otherwise that the transfer of the business had in fact been made) advised him that the old company, though formally dissolved, could still do business not inconsistent with winding-up, including the right to keep his contract alive by making the stipulated payments and the right to assign his contract with his consent.

So all the circumstances, we think, corroborate Hibbard's denial of any knowledge on his part that the old company had gone out of business and that the check of February 10th was drawn against the funds of the new company. There is, therefore, no substantial basis for challenging the dismissal of the cross-bill and the rejection of the second defense.

Regarding the first defense:

With the other matters eliminated, the case stands simply as an infringement suit against a stranger.

Hibbard claims that he was entitled to a decree on the pleadings—that after the company in its answer admitted that the old company was his licensee and was manufacturing devices which it put forth as the devices of the patents, and that the new company had taken an assignment of the license and was making and selling the same devices that the old company had made and sold, it was no longer incumbent on him to introduce proof of infringement in fact. We do not consider this a fair construction of the answer. If all matters relating to the license were stricken out, the answer would still contain the distinct averment of noninfringement, and thus an issue of fact would be joined, under which Hibbard would have the burden of proof. Such a defense is not waived by pleading a further defense of license, for the latter defense is not a confession of infringement in fact. The

defendant thereby merely takes the legal position that the complainant by reason of the license is precluded from charging infringement.

If the suit were against the old company for further royalties, that company would be estopped from contending that the devices stamped and put forth by it as the patented devices were not in truth within the patents. Sproull v. Pratt (C. C.) 97 Fed. 807; Piaget Novelty Co. v. Headley, 108 Fed. 870, 48 C. C. A. 116. But, as to the new company, Hibbard cannot both deny the relation of licensor and licensee and also claim the benefit of the estoppel that would arise from the relationship.

The company asserts that the record is barren of proof that the devices made by it are in fact covered by the patents. We find it unnecessary to set forth the items which have led us to believe that a prima facie case was made, for, when the company offered competent evidence to support its claim of noninfringement, the court sustained Hibbard's objection, and the company was not permitted to go into that defense at all. Hibbard's objection was that the testimony was immaterial and was offered too late. The court ruled that "under the pleadings the testimony would not be material to any issue, so the objection is sustained." Order of proof was within the discretion of the court; but the objection as to time was in effect overruled. The refusal to hear the company's evidence was based on a construction of the pleadings which, in our judgment, involved substantial error.

As to the cross-bill, the decree is affirmed; as to the bill and the defense of noninfringement, the decree is reversed, with the direction to grant the parties leave to take proofs.