## DUNKLEY CO. et al. v. PASADENA CANNING CO. et al.

(District Court, S. D. California, S. D.   August 19, 1918.)

### No. C-8.

1. PATENTS ⬢⟿327—INFRINGEMENT SUIT; PERSONS CONCLUDED BY DECREE.

    Defendants in an infringement suit *held* not estopped by a decree in a prior suit to which they were not parties of record, and where, pending such suit, it was stipulated by the parties in the present suit that the evidence there taken might be used in their suit by either party.

2. PATENTS ⬢⟿328—VALIDITY AND INFRINGEMENT; FRUIT-PEELING MACHINE.

    The Dunkley patent, No. 1,104,175, for a fruit-peeling machine, *held* void for anticipation; also not infringed.

3. PATENTS ⬢⟿328—VALIDITY; PROCESS OF PEELING FRUIT.

    The Dunkley patent, No. 1,237,623, for process of peeling fruit or vegetables, *held* void for lack of invention, in view of the prior art.

In Equity. Suit by the Dunkley Company and the Michigan Canning & Machinery Company against the Pasadena Canning Company and George E. Grier. Decree for defendants.

Raymond Ives Blakeslee and Dockweiler & Mott, all of Los Angeles, Cal., Fred L. Chappell, of Kalamazoo, Mich., and John H. Miller, of San Francisco, Cal., for plaintiffs.

Francis J. Heney, Kemper B. Campbell, and Frederick S. Lyon, all of Los Angeles, Cal., for defendants.

TRIPPET, District Judge. This suit is brought to enjoin the infringement by the defendants of two patents held by the plaintiffs. One of the patents, No. 1,104,175, was involved in a suit entitled Dunkley Co. v. Central California Canneries Co., et al., hereinafter referred to as the San Francisco case. That suit was tried in the United States District Court for the Northern District of California, and an appeal taken. The case was decided by the Circuit Court of Appeals and is reported in 247 Fed. 790, 159 C. C. A. 648. This patent is for a machine for peeling peaches and other fruit by a process spoken of as the "lye process." The other patent is a patent upon a process of peeling peaches or other fruit or vegetables, and known as the "lye process." The number of this patent is 1,237,623, and was issued August 21, 1917.

[1] The first matter for the court to consider, in determining the question concerning the patent for the machine, is whether or not the defendants here are estopped by the judgment in the San Francisco case. The plaintiffs claim that defendants here are in privity with the defendants in the San Francisco case, and for that reason are bound by that decision. The defendant Grier was the manufacturer of one of the machines, which was held to be an infringement of the machine patent. Grier employed an attorney when this suit was brought to defend this case. He sought to get permission from the defendants in the San Francisco case to join in the defense of that case, but, before arrangements were completed to join in such defense, there was a

⬢⟿For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

disagreement, and Grier refused to have anything further to do with it in the sense of joining in the defense thereof. Grier instructed his attorney to attend the trial at San Francisco and keep informed concerning the same. He was not, however, employed to assist in the defense of said cause. The attorney, however, was during the trial made a party of record in said cause, as attorney of the defendants therein. The defendant Grier and his wife attended the trial at their own expense. Grier also took his device to San Francisco to exhibit at the trial at his own expense. He testified as a witness therein. Other attorneys employed in the San Francisco case were employed by defendant Grier in this case. Grier in all these matters represented his codefendant, Pasadena Canning Company.

During the trial of the San Francisco case, negotiations were entered into between the parties here concerning an agreement as to the effect a decree in the San Francisco case should have, and the parties, pending the trial of the San Francisco case, entered into a stipulation as follows:

"It is hereby stipulated and agreed by and between the parties to the above-entitled suit:

"(1) That the final hearing or trial of this suit be continued over the January, 1916, term of said court, and shall not be set for trial prior to November, 1916.

"(2) That either of the parties hereto, upon the trial of this suit, may use as evidence herein, with the same force and effect as if given in open court in this suit, any or all of the testimony of any witness, together with the accompanying exhibits, forming part of the transcript and records of the trial of suit in equity No. 201, in the United States District Court for the Northern District of California, wherein said Dunkley Company is plaintiff and Central California Canneries Company is defendant, as the same is finally submitted to the latter court for determination, or either party hereto may likewise use the testimony of any one or more of such witnesses and call in open court any other of said witnesses, or any other or additional witnesses; it being the intent hereof to perpetuate for use in this suit all the testimony and proofs adduced in said suit No. 201, and render the same as available for use herein on behalf of the respective parties as though the same had been given in open court in this suit. It is further stipulated and agreed that the certificate of the official reporter to a copy of the manuscript of testimony in said suit No. 201, or to the testimony of any witness therein, shall be deemed a full and sufficient certification as to the correctness thereof, and that no further certification thereof shall be required to render the same admissible in this court under this stipulation," etc.

This stipulation was entered into on April 3, 1916, and the San Francisco case was decided on December 4, 1916.

The evidence here shows that the plaintiffs knew, at the time of entering into this stipulation, all the circumstances that tended to show that the defendants here were engaged in defending the San Francisco case, and, notwithstanding that knowledge, the plaintiffs entered into that stipulation. Now, if the plaintiffs believed at the time that the defendants here were estopped, why did the plaintiffs enter into a stipulation concerning the use of the evidence, as set forth in that document? What was the use of preserving the evidence, as introduced in that case, to be presented here as evidence in this case, if the defendant here were to be estopped by the judgment in the San

Francisco case? It seems perfectly plain that the plaintiffs cannot be permitted to assume the situation that they now seek to assume, because it is inconsistent with the position they took in entering into this stipulation.

The defendant Grier never directed any attorney to represent him or the Pasadena Canning Company in the San Francisco case, as a litigant in that case. Grier was neither a party nor a privy in that litigation. He had no legal right to defend or control the proceedings, nor to appeal from the decree. He was a stranger, and was not concluded by that judgment as a party thereto. He was indirectly interested in the result, because the question there litigated was one which might affect his own liability as a judicial precedent in this suit, and therefore he sought to assist and advise the defendants in that case, in order that there might not be a precedent established to his injury.

The record does not disclose a state of facts that would justify the court in holding that the defendants here are estopped by the San Francisco record. Having determined that the judgment in the so-called San Francisco case is not an estoppel, it is necessary for the court to determine what effect shall be given to that decision. The whole record, including all the evidence taken in San Francisco, is introduced in evidence here. In addition to that, the court sat for many, many days taking evidence not in the San Francisco case. The proof here is so entirely different from the proof in the San Francisco case—that is to say, the evidence here contains so much proof, in addition to the proof taken in the San Francisco case—that this court cannot consider the question here involved as having been decided. If the San Francisco case were based upon the same facts proved in this case, this court would be strongly inclined to follow the decision in that case, regardless of whether or not there is an estoppel. But this court must be bound by the proof produced here, and what is decided must be the opinion of this court, and must contain the convictions of the judge. If any doubt remains, after considering all the evidence introduced here, the court should give great weight to the opinion rendered in the San Francisco case, for the purpose of resolving that doubt. Under the circumstances the San Francisco case cannot lead this court to a conclusion.

[2] The plaintiffs claim that Dunkley conceived the process of peeling peaches by lye in 1901; that he made his first model or experimental machine in the peach season of 1902, and the plaintiffs insist that the Dunkley patent should be carried back to these dates. The first question, therefore, for the court to consider is: How far back of the date of application for patent can the Dunkley invention be carried?

Mr. Dunkley, the patentee, and his son, both testify here that the first machine that was built, as an invention of Dunkley, was built in the early part of the peach season of 1902. Mr. Dunkley testifies that he conceived the process in 1901; that this first machine, made in 1902, and the improved machine, which they testify was made in 1902–03, were used in 1903, in the Dunkley Company's factory, at South Haven, Mich., and most of the peaches in that season peeled by the last-men-

tioned machine. Their testimony is supported by the evidence of other witnesses, either by testifying to circumstances that would indicate that the first or model machine was made in 1902, or directly and positively to the fact. Among these witnesses are Simpson, Schau, Sergeant, Wiers, Mrs. Lilly, Mrs. Mace, and Verhage and wife. The evidence given by Crary and Mrs. Wing Eastabrook is so confusing and contradictory that no weight can be attached to it. There does not seem to be any documentary or circumstantial evidence of any kind tending to support this testimony.

There is much circumstantial and documentary evidence in the case tending to show that Dunkley did not make his first or model machine prior to the summer of 1903. Dunkley made his application for patent on November 29, 1904. Dunkley was an inventor long prior to that time—had taken out patents and knew of the necessity of covering inventions with patents.

There was an interference proceeding between Dunkley and one Beekhuis. In that proceeding the evidence, on behalf of Dunkley, carried the date of the construction of his first machine back to July, 1903, only. Mr. Dunkley testified, in the interference proceeding, that he first conceived the thought of the structure in the month of August, 1902, and that he made a drawing in 1902. This drawing, however, is not produced. He testified further in that proceeding that the model machine was made in the month of July, 1903, and put together at the factory at South Haven, Mich., and used there. Other evidence, in the interference proceeding, was along the same line. One witness, a Mr. Newton, produced by Mr. Dunkley in the interference proceeding, who testified that this machine was made in July, 1903, now testifies that he was mistaken, and that it was made later that year.

Counsel for the plaintiffs argue that the evidence in the interference proceeding should be construed with reference to the fact, as I understand it, that it was only necessary to prove, in this interference proceeding, that the invention of Dunkley was prior to that of Beekhuis; that it was not necessary for Dunkley to carry his invention back to the date that he now claims he made it. This contention of counsel does not appeal very strongly to the court. It would seem that these statements of Dunkley, and the evidence produced on that hearing, are very strong admissions that his first or model machine was made in 1903, and not in 1902. In Dunkley Co. v. California Canneries Co., No. 203, in equity, Northern District of California, on December 3, 1903, Mr. Dunkley, patentee, testified that the first machine was put up in June or July of 1903. Mr. M. E. Dunkley, the son of the patentee, testified in both of these proceedings, practically the same as his father.

The books of Mapes, which show on their face their authenticity, indicate that material to construct the first or model machine for the Dunkley Company was supplied to the Dunkley Company in the latter part of September, 1903. The books of Riddeford Bros., of Chicago, are in evidence. These books show that they are old, very much used, and they certainly show on their face that they have not been doctored.

They show that they have been systematically and accurately kept; that brushes were made for the Dunkley Company, like the brushes used in the first or model machine. The plaintiffs offer no explanation anent this evidence. The books of John F. Noud Lumber Company are in evidence. This company supplied lumber to the Dunkley Company in 1903. They show the delivery of lumber suitable to construct a long table, at which women sat to peel peaches in 1903. There was such a table in the building, about 150 feet long. The books of John C. Miller, a plumber, of South Haven, Mich., are in evidence. These books show that Miller supplied 300 feet of double-headed galvanized trough to the Dunkley Company July 23, 1903. There was a trough under this long table, on each side thereof, such as would be built from such material. These troughs were used by the women to wash their knives in while they were peeling. The books of Noud and Miller are almost conclusive evidence that that long table was built just prior to the peach season in 1903.

There is no explanation from the plaintiffs as to what such material, sold the Dunkley Company, could be used for, it not used as claimed by the defendants, in the construction of the table. The construction of this table, and the existence thereof, in the peach season of 1903, is utterly inconsistent with the theory of the plaintiffs' case. The plaintiffs claim that a complete and perfect machine, namely, the second machine, was operated during the peach season of 1903, where this long table stood. Plaintiffs further claim that practically all the peaches of the season of 1903 were peeled by the second machine. Several photographs, which witnesses testify were taken in 1903, are in evidence. One of the photographs is this particular long table, with the women sitting at it peeling peaches by hand machines and knives. The photograph of the peaches on the table shows that the peaches were peeled by a knife or hand machine, which made little ridges around the peach. When a peach is peeled by lye, it is perfectly smooth, and such ridges do not appear. This is inconsistent with the theory of plaintiffs' case. One of these photographs contains a picture of a singular circumstance, tending to show that the picture was taken in 1903. This circumstance is that the picture itself shows a bouquet, containing the date of a party held by the employés of the factory in 1903. There can be no doubt in any one's mind but what that picture was taken in 1903. It shows many of the same people that sat at the long table peeling peaches by hand during that year.

This evidence of these books and photographs must be explained by witnesses, and the explanation has been ample to show that these books and photographs represent what the defendants claim for them. For instance, take the books of Mapes. They recite that the material was furnished for a peach-peeling machine. Mapes and Stewart Campbell corroborate what these books show, and the books certainly corroborate them. The testimony of Mr. Riddeford, concerning his books, is straightforward and clear. He corroborates Stewart Campbell concerning the ordering of these brushes, and the books certainly corroborate both of them. If Stewart Campbell did not order these brushes, as claimed by him, how did it happen that the defendants could find

this testimony, and the plaintiffs do not know anything about the account? The books of the lumber company and Miller are satisfactorily explained. They corroborate Stewart Campbell concerning the building of the table in 1903. It is proven by a great many witnesses that the photograph introduced in evidence of the long table, and the women peeling peaches thereat, was taken in 1903. Some of the reasons assigned by some of these witnesses, for their convictions that this photograph was taken in 1903, are very simple. Each has a different circumstance by which the witness' mind has been refreshed, and which corroborates the witness concerning the date. If these pictures that were taken in 1903 show what was going on in the factory of the Dunkley Company at that time, it certainly would be a most remarkable thing that no photograph was taken of this wonderful machine for peeling peaches, if it existed at that time.

The letters passing between Dunkley and his business associates, the Nortons, strongly corroborate the theory of the defense. If this correspondence had passed between Dunkley and Norton in 1902 and 1903, instead of between 1903 and 1904, it would, of course, have supported Dunkley; but, as the correspondence stands, it supports the defense. For instance, September 17, 1904, Dunkley wrote to Norton, "The peeler works fine;" and on September 22, 1904, he wrote, "The peeling machine is running fine; so are the rotaries." On February 10, 1904, Mr. Dunkley wrote to Mr. Norton:

"We have the lye machine now nearly completed, with the rotary cleaner attached. This machine Mr. Campbell calls the 'prevaricator.' This we are sure will work, as we worked the same thing last year, and there is no question about it."

There is certainly no intimation in this letter that the machine was used in 1902; but does not it clearly show that he was informing his business associates that they had experimented with the machine in 1903?

There is other documentary evidence, such as the books of the Clark Engine & Boiler Company, which throw more or less light upon the controversy. Then there is the testimony of Crosthwaite, which is almost documentary evidence, because it is based upon a newspaper article concerning the operation of the factory. It was written October 1, 1903. He went there for the purpose of writing up an article about the factory, and, if this wonderful peach-peeling machine had been in operation he certainly would have had an account of it in his article. Referring to his article appearing in the paper, he testifies that there was no such machine there.

It is proper that the court should notice especially the testimony of Stewart Campbell. Reference has already been made to much evidence to corroborate his statement concerning the making of the first or model Dunkley machine; but there is much other evidence to corroborate it. The evidence of the plaintiffs shows that Stewart Campbell was regarded as a sort of genius. He was there making new machines. He made the peach separator and a peach pitter. The letters of Mr. Dunkley to his associates show that Stewart Campbell

was regarded by him as the man who would most likely make the machine, and they show conclusively that Stewart Campbell made the three-line or second machine. This is the machine exhibited by the drawings in the patent, and which the defendants claim was never used until 1904. There is no reason in any event for discrediting Campbell's story.

The first or model machine is a reproduction of the Baker orange washer, patented many years before. It is almost an exact reproduction of the drawing set forth in the Baker orange washer patent. The only difference between the first or model Dunkley machine and the Baker orange washer is that in the Dunkley machine there were three pipes, with a single row of perforations in each, while in the Baker orange washer there was one pipe, with three rows of perforations for sprays. In the Dunkley first or model machine brushes as conveyors were put on the belt, instead of some other kind of conveyors, as on the Baker orange washer. The difference between the two is simply a mechanical divergence. I cannot help but think that the idea for the first or model Dunkley machine was taken from this patent. There is no evidence that Campbell ever saw the drawing; there is, however, no evidence that he did not see it. Campbell's testimony would seem to indicate that he wanted it understood that he devised this first or model machine, and that it was an original creation of his own. This may be so, and yet his ideas may have come from a vision of the Baker Orange Washer patent drawing. He may have seen it, and forgotten that he had.

It is also proper that the court should refer to the evidence of William Brunker. It is argued that the evidence of Brunker is most astounding, and that it should not be believed. Brunker, in his evidence, does not seem to take credit to himself for making any discovery. The process of peeling peaches by hot lye had been known for a generation before Dunkley made his experiments. It was inserted in a publication, known as the "Archdeacon's Kitchen Cabinet," which was in existence in 1876. It had been previously patented by Mrs. McDermott in 1895, and it was well known even in South Haven, where Brunker worked. The method he used was the common form of using that process in peeling peaches. Why, then, is his story to be regarded as startling and unworthy of credit, as claimed by the plaintiffs? His story is very simple; he said that he, at the instance of Mr. Dunkley, experimented with the process of peeling peaches by lye. The only thing he did that could be regarded as new was to rub the peeling off with a brush. He states that Dunkley said, "What you are doing with your hands, we must do with a machine." This is a very simple story. To my mind it corroborates the description given of the machine in the patent. It convinces me that Mr. Dunkley originally thought that the brushes had a great deal to do with the process and the success of the machine.

There are many witnesses, on behalf of defendants, who testify that the Dunkley machine was made in the autumn of 1903, and first used then. Other witnesses testify to circumstances which tend to corroborate these witnesses. Take the evidence of Mrs. De Pue, a very

bright and intelligent lady—a woman of authority in the Dunkley factory. She testifies that she did not want to come to California; refused to come, until they proposed to take her deposition; that when she was approached by the defendants concerning the case she immediately communicated with Melville Dunkley. She went to the office of the Dunkley Company's attorney to tell him what she knew. Subsequently, when she was further approached by agents of the defendants, she communicated the fact to the Dunkleys, and offered to testify for the Dunkley Company, if they wanted her evidence as she stated it to them. This shows that she is a fair witness. Take her simple story that, in the autumn of 1903, she pitted a pan of peaches, peeled by the lye process. She told in a simple way this simple story. She did not remember the small things surrounding the circumstance, and that is to her credit as a witness. If she had been lying, she would have testified to have remembered many of the trifling details concerning which she was asked. Many other witnesses might be mentioned, who told simple stories that strongly sustain the theory of the defense, such as Augensen and Hetherington. The attorneys have so carefully digested and analyzed the evidence that it would not be much labor to state here what each of the great number of witnesses, testifying on behalf of the parties hereto, said; but it is deemed unnecessary.

It is sought by the plaintiffs to discredit the testimony of the witnesses for defendants, because their expenses and per diem were paid to them to come here and testify. A trip to California might influence the testimony of some witnesses, but it is hardly to be believed that the testimony of so many witnesses could be influenced in such a way. If the expenses and per diem were not paid by the plaintiffs to their witnesses to come here and testify what shall we think of them? Would it not show that they were greatly interested in the plaintiffs winning the case? Then how shall we weigh the circumstances concerning the payment of witnesses' expenses and per diem, or not paying them?

In view of what has been said, and much more that could be said, the court is convinced that the first or model machine ever built for Dunkley to peel peaches by the lye process was built in the autumn of 1903, and no machine at all was built in 1902. The evidence heretofore stated tends strongly to prove that the Dunkley conception was not made until the summer of 1903, and that Mr. Dunkley is wrong in his claim to a conception at a prior date. It is therefore the opinion of this court that the Dunkley patent cannot be carried back beyond the summer of 1903. It seems proper to say that the evidence convinces the court of the above conclusion beyond a reasonable doubt.

Was the Dunkley machine anticipated? Having reached the conclusion that the Dunkley invention cannot be carried back of the summer of 1903, it follows necessarily that the Pyle machine, being a combination of the Cunningham prune dipper, the Anderson-Barngrover & Co. prune grader, with the sprays thereon, the Grier grasshopper and shaker machine, with the sprays thereon, and the Roach (so-called) "squirrel cage" pea-grader attachment, were each and all

anticipations of the Dunkley machine, in so far as in issue here. Each of these machines had a spray to wash the peeling from the peaches. The Pyle machine was successfully used in 1901. This is conclusively shown by the records and files of the Pyles, and these are amply corroborated by disinterested third party witnesses. Even if the Dunkley invention could be carried back to 1902, this Pyle machine would be prior. It is wholly unnecessary for the court to describe these machines, for it is plain they were infringing, if not prior.

Much stress is laid upon the claim that the Dunkley machine sprayed the water under hydraulic pressure of great force. If the amount of the pressure were the controlling feature in the case, it would seem that even in this the Dunkley machine was anticipated, for a pump was installed to assist the pressure in the Vernon machine at Fresno, and the Dunkleys did not install a pump to assist the pressure until 1905. But the amount of pressure placed upon the water cannot control here, because it is a matter that must be regulated during the operation of the machine. The amount of pressure is varied according to the character of the fruit and according to the condition of the lye solution. It is simply a question of exercising mechanical judgment in the operation of the machine.

The plaintiffs claim that the Dunkley machine should have a broad interpretation, covering the spraying of the water upwardly on the fruit. The defendants have never used a machine with peeling jets of water spraying upwardly on the fruit, nor have they used a machine where jets of water strike the fruit tangentially. The question, therefore, concerning the validity of the plaintiffs' patent as to peeling jets or sprays of water playing upwardly or tangentially on the fruit, is not involved in this case.

Dunkley was late in adopting the device of pitting the peaches before subjecting them to the peeling process. The fact that he ran the peaches through the machine whole largely necessitated stronger hydraulic pressure producing the jets of water than was necessitated in the other machines.

The Pasadena washer does not infringe the Dunkley patent, even giving the patent the very broadest interpretation and validity. The Pasadena washer is but an improvement upon the McDermott machine. Mrs. McDermott, it would seem, mothered the progress made by this machine in the handling of peaches. The claim made by the plaintiffs that the Pasadena washer uses a jet or spray of water in the washing of peaches is far-fetched. What difference is there between Mrs. McDermott's machine, where the peaches are lifted out of one compartment of the machine into another, and the water sprayed through holes, and the Pasadena washer, where the peaches are lifted out of one compartment and brought into another with similar holes in the buckets or dippers? In some of the Pasadena washers it is true that the water can be made to spray into a compartment or compartments of the washer, but the defendants never intended that these sprays should be used for the purpose of peeling peaches, but only for the purpose of filling the vats with water. Such sprays would be wholly inefficient for the purpose of peeling peaches.

[3] Is the Dunkley process patent valid? The most essential feature of this patent is the use of lye or caustic soda in a hot solution. Mrs. McDermott secured a process patent for peeling peaches with lye and alum many years before the Dunkley experimentation. She asked for a claim in her patent without the use of alum, but this was disallowed. Her application for a patent, with such a claim, however, was a disclosure to the world. Then why should Dunkley have a patent for the use of lye or caustic soda, when she could not get one? Her process contemplated the use of hot scalding lye, and then washing the lye off with water. There is an allowance in the Dunkley patent of hydraulic sprays of sufficient force to remove the loosened skin. This, however, is not an essential feature of the process. So far as the process is concerned, the cleaning of the fruit may be done in any manner. The element in the claims of Dunkley's process patent, concerning the passing of the fruit into the range of action of hydraulic sprays of sufficient force to remove the loosened skin, amounts to no more than the patenting of the result of the Dunkley machine. I am clearly of the opinion that there is no validity at all to the Dunkley patent. No. 1,237,623.

The defendants will draw a decree, dismissing the bill and supplement thereto, in accordance with this opinion, and. submit it to the plaintiffs.