## DUNKLEY CO. v. CALIFORNIA PACKING CORPORATION.

(District Court, S. D. New York. April 23, 1920.)

No. 572.

1. Patents ☞213—License to corporation and its "successors" held to pass to corporation purchasing its business and assuming its obligations.

A license to a corporation, "for the benefit of itself and its successors * * * for the use of the said invention in connection with its business relative to the canning or treatment of fruit," *held* to inure to the benefit of another corporation to which the licensee sold its "business franchise and property as a whole," and which continued its business, assumed its debts and obligations, and also purchased practically all of its stock.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Successor.]

2. Patents ☞328—1,104,175, for machine for peeling peaches and other fruit, held void for lack of invention.

The Dunkley patent, No. 1,104,175, for a machine for peeling peaches and other fruit, *held* void for anticipation and lack of invention.

3. Patents ☞328—1,237,623, for process of peeling peaches, held void as for the function of a patented machine.

The Dunkley patent, No. 1,237,623, for process of peeling peaches or other fruits or vegetables, *held* void as for the function of a machine previously patented.

In Equity. Suit by the Dunkley Company against the California Packing Corporation. Decree for defendant.

Fred L. Chappell, of Kalamazoo, Mich., and Drury W. Cooper and Robert F. Little, both of New York City, for complainant.

Gravath & Henderson and James R. Sheffield, both of New York City, and Francis J. Heney, Frederick S. Lyon, and Kemper Campbell, all of Los Angeles, Cal., and Nicholas A. Acker and Frank D. Madison, both of San Francisco, Cal., for defendant.

AUGUSTUS N. HAND, District Judge. This is a suit for infringement of letters patent No. 1,104,175, issued July 21, 1914, to Samuel J. Dunkley, and letters patent No. 1,237,623, issued August

21, 1917, to the same person. The first patent relates to machines for peeling peaches or other fruit or vegetables, and the second to an improved process for peeling peaches or other fruit or vegetables. The claims in the first patent relied on are 5, 6, 14, 19, 20, 21, 22, 23, 24, 25, and 26, and in the second, 4, 5, and 7.

The first patent was held valid and infringed in a suit by the above-named complainant, the assignee of the patent, against the Central California Canneries Company, and the decree of Judge Van Fleet in that case was affirmed in the Circuit Court of Appeals for the Ninth Circuit (247 Fed. 790).

Both patents were held invalid for anticipation and lack of invention in the case of Dunkley Co. and Michigan Canning and Machinery Co. v. Pasadena Canning Company and George E. Grier (261 Fed. 203), by Judge Trippet, and his decision has been recently affirmed by the Circuit Court of Appeals of the Ninth Circuit (261 Fed. 386). Judge Rudkin, who wrote the opinion, did not place the decision upon anticipation or lack of invention, but upon noninfringement. He said as to the first decision of the Circuit Court of Appeals:

"For, assuming that the decision in that case should be followed here and is binding upon the appellees, the question of infringement was not there involved, because the Grier machine or device then before the court is not involved in the present case."

The foregoing language of the decision of the Circuit Court of Appeals would seem to me to indicate that the court, while it did not attempt to disturb the decision between the parties in the prior case, declined to consider the question of anticipation there involved and to say whether it would follow its former decision or not, contenting itself with disposing of the question of infringement only.

After hearing the testimony, I was very clear that the complainant had not a valid patent, and that the decision of Judge Trippet was correct. As the Circuit Court of Appeals for the Ninth Circuit upon a different record from the one presented to me had held the original patent valid, and shortly after the briefs were submitted I learned that the appeal in the second case was soon to be heard, I thought it better to make no disposition of the matter until the Circuit Court of Appeals had passed upon a record not very dissimilar to the one before me, and had a chance to determine whether or not Judge Trippet was right in the decision of the case that seemed at first sight to differ from the first decision of the Circuit Court of Appeals. I confess I regret to have had no more definite disposition of the various findings of Judge Trippet, but as I have examined the voluminous briefs and the printed record of the testimony before me and some excerpts from the testimony in the other cases, I am more convinced than ever that complainant should not prevail.

[1] At the very outset complainant is met by the very formidable defense that the defendant is a licensee under the Dunkley patents. The Dunkley Corporation granted a license to the California Fruit Canners' Association—

"for the benefit of itself and its successors * * * for the use of the said invention in connection with its business relative to the canning or treatment

of fruit * * * the said license herein granted to be for the benefit of the said California Fruit Canners' Association and its successors for the full term of years of any letters patent which may hereafter be granted for the invention set forth in the said application Ser. No. 234,715 now pending in the United States Patent Office."

It may be here noted that the foregoing application seems to have been divided in the Patent Office, and thereafter to have resulted in the two patents in suit.

After the above license was granted to the California Fruit Canners' Association, that corporation sold, transferred, and assigned to the defendant its "business, franchise and property as a whole," and since such sale has never done any business. The defendant thereafter reduced its capital stock, and about two months after the transfer acquired all but ten shares of the stock of the California Fruit Canners' Association. The transfer was accompanied by an agreement of the defendant to assume all the debts and obligations of the transferor.

The defendant insists that under these circumstances, although no merger or consolidation was technically affected, nothing was left of the California Fruit Canners' Association but a mere corporate shell, and that the transaction was in effect a merger carried out in the only way then possible under the California statutes.

In the case of Lightner v. Boston & Albany Railroad, 1 Low, 338, Fed. Cas. No. 8,343, there was a Massachusetts statute providing for the consolidation of the Boston & Worcester and Western Railroad corporations. The Boston & Albany Railroad was formed pursuant to this legislation, and the statute declared that the new corporation should have, hold, and enjoy all the powers, rights, privileges, franchises, property, claims, demands, and estates which at the time of such union were held and enjoyed by either of the then existing corporations. The old corporations were still kept in existence for certain purposes, but the court held that a license belonging to the original companies to use a patented invention passed to the Boston & Albany Railroad. In that case the word "successors" does not seem to have appeared in the licenses. This case was referred to by the Supreme Court with approval in Lane & Bodley v. Locke, 150 U. S. 193, 14 Sup. Ct. 78, 37 L. Ed. 1049. That court, in citing the Lightner Case, said that it was there held:

"That a license, though not usually transferable, is transmissible by succession to a corporation formed by the union of two licensees succeeding to the obligations of both, for the reason that the consolidated company is the successor rather than the assignee of the original companies."

In the Lane & Bodley Case it appeared that a copartnership which had obtained an implied license was incorporated. While it is true that there the patentee worked for the corporation as well as the partnership and there were thus other facts than the mere practical perpetuation of the copartnership in corporate form, nevertheless the transmission of the license by reason of the practical identity of the business of the partnership and the corporation was, in the opinion of the court, an apparent incident of the transaction.

In the case of Hapgood v. Hewitt, 119 U. S. 226, 7 Sup. Ct. 193, 30

L. Ed. 369, the court held that a license to a corporation, afterwards dissolved, would not pass to a corporation which had been formed by the stockholders of the defunct company, where there were no words indicating the right of the licensee to assign.

In Niagara Fire Extinguisher Co. v. Hibbard, 179 Fed. 844, 103 C. C. A. 330, the Circuit Court of Appeals for the Seventh Circuit held that a corporation which took from another, afterwards dissolved, all of its property, profits, and good will by a bill of sale, but without assuming any of the liabilities of the grantor, was not the legal successor of such grantor and did not succeed to its right under a contract granting it a license which by the terms of the contract was not assignable without the consent of the patentee.

In the present case the license was—

"for the use of the said invention in connection with * * * (the) business relative to the canning or treatment of fruit * * * the said license herein granted to be for the benefit of the said California Fruit Canners' Association and its successors."

The word "successors" originally was used in connection with a corporation sole, where the person, but not the corporate entity, would change. It was also used in connection with an aggregation of persons named in the charter, who would necessarily change, and to whom corporate franchises were granted. These words in the license granted to the California Fruit Canners' Association add nothing and have no significance if they are to be taken in the antique sense for which the complainant argues. I think the use of the word "successors," in connection with the other words, "for the use of the said invention in connection with its business relative to the canning or treatment of fruit," clearly indicates a purpose to allow the transmission of the license to a corporation fairly succeeding to the business of the California Fruit Canners' Association. Any other interpretation would seem technical and unjust under the circumstances.

The cases of Lightner v. Boston & Albany Railroad, and Lane & Bodley v. Locke, supra, are in line with the results that I have reached and show that the federal courts have treated situations like the present in a broad way and have allowed corporations succeeding to the business of a licensee to succeed to the license where the particular circumstances of the case warranted such a result.

The case of Niagara Fire Extinguisher v. Hibbard, supra, seems in a general way to support the view I have taken. It is true that the decision was that the license would not pass, but that was because there was a contract against an assignment without the consent of the licensor in the bill of sale from the licensor to the new company. The court said:

"The grantee neither assumed, nor took the property subject to, the liabilities of the grantor. * * *"

And the court added that—

"The Ohio Company was not the successor (or heir) of the West Virginia Company."

Apparently the court would have reached a different result if there had not been a covenant against assignment, and the word "successor" had been used.

[2] Coming to the question of the validity of the patent to Dunkley, it is first necessary to consider the date of his invention. His attempt to carry it back to August, 1902, seems to be met by an overwhelming weight of testimony to the contrary. This weight of testimony is sought to be answered principally by that of Dunkley himself, his son, and Mrs. Easterbrook, his sister-in-law, and the witness Harvey Schau, at present an employee of the Dunkley Company. There are other witnesses who in general seem to have been employees. The defendant in answering Dunkley's testimony has been obliged to go into the enemy's camp and in doing so has presented a great number of witnesses who knew nothing of a machine constructed in 1902. More than that, Dunkley, in his preliminary sworn statement in the Beekhuis interference proceeding, said:

"That he conceived the invention set forth in the declaration of interference during the month of August, 1902, that the invention was first disclosed by him to us during the month of September, 1902; that a drawing of the invention was made during the month of September, 1902; that he made no model of the invention; that the invention was first embodied in a complete working structure during the month of July, 1903. * * * *"

Moreover, in the case of Dunkley Company v. California Canneries' Company, Dunkley testified, on December 3, 1915, as to his original experimental machine, as follows:

"Q. When was the first put up? A. As near as I can remember, it was June or July of 1903."

It was not until the later litigations, when the date of the Grier machine came into question, that Dunkley testified that a machine was constructed in the autumn of 1902. It is significant that no drawings such as Dunkley claims that he made in 1902 have ever been produced, and that the disclosure of his invention to his son substantially depends upon the testimony of these two interested witnesses. Judge Trippet has discussed this testimony carefully and has reached the conclusion that Stewart's testimony that he made the first machine in 1903 is correct.

The Norton letters in view of the close financial relations between Dunkley and Norton, and his apparent dependence upon the latter as a financial backer, strongly corroborate the position of the defendant.

In the various alleged anticipating devices which were exhibited to me at the time of the trial, the one which impressed me most was the Baker-Chalker machine. This seemed to work perfectly and the use of one like it at the Fresno Packing House of the California Fruit Canners' Association in 1902 was a clear anticipation of the patent in suit. No definite pressure is called for by the first patent to Dunkley, and the pressure which was used at the Fresno plant was evidently sufficient to peel a very large number of peaches.

The witness Fred Stebley was called for the first time before Judge

Trippet. He saw the operation of the Baker-Chalker machine in 1902, and testified as follows:

"Well, I observed that it was a new application of the machine which I had not seen before, and it was being used as I say in which to remove the peel from peaches preparatory to canning and it was done in conjunction with —by using water in conjunction with the brushes."

There can be no doubt whatever that all this occurred in the summer of 1902. Stebley refreshed his recollection from a letter which he had written in July of that year, and Vernon died in December.

Horace G. Baker likewise testified before Judge Van Fleet, in the San Francisco case, as follows:

"Q. Describe the action of the water and of the brushes on the fruit as you observed it at that time. A. The brushes themselves turned this fruit over as they touched it, and the water washed the skins off. There was not much left but this disintegrated soft pulp, like a pulp almost."

R. I. Bentley was likewise a witness who testified for the first time as to the Vernon use before Judge Trippet. He said that the whole pack of peaches at the cannery, in the neighborhood of 100,000 cases, was peeled in 1902 by the Baker-Chalker machine. He said:

"The water had the effect of cleansing the brushes and the fruit."

He also said (at page 3697 of the Los Angeles record):

"Why, as I stated, there were three perforated pipes, one played on one brush and one on the other and on the fruit."

This testimony which was before Judge Trippet was significant. Moreover, Mr. Bentley testified before me that 50 per cent. of the pack went through in halved condition because it had not been pitted and was found difficult to handle after it was reduced to a pulpy condition by passing through the machine.

The Baker-Chalker machine was not before Judge Van Fleet, and if it had been, supplemented by the additional testimony that was before Judge Trippet, I believe he would have had no doubt that a valid prior use was established. The very fact that there is testimony from Cobbey and Combs that in the afternoon, when the water pressure was lower, they applied a pump to increase the pressure, seems to show the use of the jets in peeling the peaches, and the identity of function between the Baker-Chalker machine exhibited to me and that of Dunkley is convincing evidence that the latter contributed nothing to the art which can be regarded as amounting to invention.

The specification of the patent in suit provides as follows:

"My invention consists in the means I employ to practically accomplish this object or result; that is to say, it consists, in combination with a peel or skin softening, disintegrating or shriveling means or device, preferably consisting of a tank or chamber containing a heated fluid, and a heater for the same, a conveyor for automatically conveying the peaches through the skin softening, disintegrating or shriveling device and subjecting the peaches to its action for uniform and measured time, a chute or device for delivering the peaches in single file line to a brushing and washing mechanism, and a peach brushing and washing mechanism, preferably comprising a group of three long perforated pipes for spraying water upon the moving line of peaches, and subjecting them to a water brushing action, an endless belt brush arranged between the

two lowermost perforated pipes and operating to brush the peaches as they are rotated and to convey them along, and a pair of oppositely rotating cylindrical brushes operating both to rotate and brush the peaches, and having hollow perforated pipe cores for spraying the rotary brushes with water, and rotary cylindrical rubber sponge brushes, also having hollow perforated pipe cores for supplying the same with water; whereby the peaches may be very rapidly and cheaply and perfectly peeled, without waste or injury."

It is true that the claims in suit rely specifically upon jets of water as a means of peeling the peaches, but their language I think is to be taken in connection with the disclosure of the specification which certainly shows a co-operation of the brushes which carry the peaches with the peeling mechanism. A similar co-operation was exhibited in the Baker-Chalker machine. If the claims be read so broadly as to ignore the general form of mechanism described in the specification and shown in the drawings and to the extent of discarding the brushes, it would seem to me that the Pyle peach-peeling apparatus which employed no brushes to turn the fruit would read on the claims. In view, however, of the fact that the Pyle peach-peeling apparatus employed no brushes to turn the fruit and that this mechanism seems an essential part of the Dunkley device, I shall not base my decision upon the alleged prior use of Pyle. Nor shall I rely, as Judge Trippet did, upon the Grier invention because of some possible uncertainty as to the date of the latter and the reduction of the invention to practical use. While I am inclined to agree with Judge Trippet that both of these devices are a bar to the complainant's patent, I prefer to rely upon the Vernon use of the Baker-Chalker machine.

As for the Roach prior use, I have some doubt as to its practicability in handling a large number of peaches, and never regarded either that or the McDermott process as having a close bearing upon the question of invention.

As it is my opinion that no invention was involved in the Dunkley patent, it is unnecessary to consider the question of infringement in the various devices before the court.

[3] The second patent to Dunkley is for a process involved in the operation of the Dunkley machine, that is to say, for a mere function, and is therefore invalid. Risdon Iron & Locomotive Works v. Medart, 158 U. S. 68, 15 Sup. Ct. 745, 39 L. Ed. 899; Westinghouse v. Boyden, 170 U. S. 556, 18 Sup. Ct. 707, 42 L. Ed. 1136.

For the foregoing reasons, the bill is dismissed, with costs, in respect to the first patent for lack of invention, and, in respect to the second patent, because it covers only the function of an apparatus already patented.