## WESTINGHOUSE ELECTRIC & MFG. CO. v. DIAMOND STATE FIBRE CO.

(District Court, D. Delaware. March 27, 1920.)

No. 378.

1. **Injunction ⬦63—Granted to restrain interference with contract.**

   One who induces a party to a contract to break it, intending thereby to injure another person or to get a benefit for himself, commits an actionable wrong, unless there is sufficient justification for the interference, and if such interference would result in irreparable injury, equity has jurisdiction to enjoin it, provided the contract is lawful.

2. **Monopolies ⬦12(2)—Contract requiring patent licensee to buy materials of licensor not invalid, as creating a monopoly in a "line of commerce."**

   In a contract by which the owner of patents granted a license to manufacture the patented article, assuming the patents to be valid, a provision requiring the licensee to purchase the material used in such manufacture exclusively from the licensor or its licensees *held* not invalid, under Clayton Act, § 3 (Comp. St. § 8835c), as tending to create a monopoly in a "line of commerce."

3. **Injunction ⬦128—Prima facie right to injunction restraining interference with contract.**

   In a suit to enjoin interference with a contract granting a license to manufacture under a patent by which the licensee is to pay complainant royalties, complainant makes a prima facie case on the issue of validity of the contract by proof that he is the owner of the patent and that it is valid on its face.

4. **Torts ⬦12—Interference with contract by third person for his own profit not justified.**

   A defendant *held* not justified by the right of competition in inducing a licensee of complainant to purchase material from it in violation of the license contract, of which it had knowledge, by an offer of lower prices and a guaranty of protection from suit, nor by a belief it may have had that the contract would not be violated.

5. **Injunction ⬦136(2)—Preliminary injunction restraining interference with contracts.**

   Preliminary injunction granted, restraining defendant from interfering with contracts between complainant and its licensees under patents.

In Equity. Suit by the Westinghouse Electric & Manufacturing Company against the Diamond State Fibre Company. On motion to strike counterclaim and for preliminary injunction. Motion to strike denied, and for injunction granted.

Willard Saulsbury, of Wilmington, Del., and Kerr, Page, Cooper & Hayward, of New York City, for plaintiff.

Howson & Howson, of New York City, for defendant.

MORRIS, District Judge. The bill of complaint of the Westinghouse Electric & Manufacturing Company, plaintiff herein, alleges the existence of a contract between it and Eisemann Magneto Company (hereinafter referred to as the Eisemann Company); that the defendant, Diamond State Fibre Company, maliciously induced the Eisemann Company to break such contract; and that the plaintiff has similar contracts with numerous other persons, with which the defend-

⬦For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

ant is also threatening to interfere. The bill prays that the defendant be enjoined from any further violation of the plaintiff's rights in the premises, for injunction pendente lite, and for an accounting.

This is an application for a preliminary injunction, which was heard upon ex parte affidavits and exhibits. The facts alleged in the bill are, in substance, that the plaintiff is the owner of letters patent of the United States No. 1,167,742, for improvement in gear wheels, and No. 1,167,743, for improvements in gears, granted to it July 11, 1916, as assignor of Frank Conrad; that the plaintiff manufactured and sold gears embodying the improvements covered by said patents and also manufactured the gear blanks and materials which it sold to the manufacturers of gears; that the demand for its products aforesaid was great and its business became large and profitable; that with a view of meeting the demand the plaintiff adopted a system of licensing both manufacturers and users of such gears, and under such plan it granted licenses identical in form and conditions to 80 gear manufacturers, among whom was the Eisemann Company; that the contract with the Eisemann Company, made on January 1, 1918, granted to it a license to manufacture and use or sell gears covered by said patents, and the plaintiff by the contract agreed to supply, either direct or through its licensed gear material manufacturers, to the Eisemann Company the material necessary for the manufacture of such gears; that the Eisemann Company on its part by said contract covenanted, among other things, to pay the plaintiff during the term of the license, which was unrevocable by the Eisemann Company, a certain royalty, and to purchase exclusively from the plaintiff, or its licensed gear material manufacturers, material or gear blanks used by it in the manufacture of gears covered by said patents; that the defendant, knowing the contract relations between the plaintiff and the Eisemann Company, and with a view of appropriating to itself the profits and advantages accruing to the plaintiff from its contract aforesaid, induced the Eisemann Company to violate its contract with the plaintiff and to purchase from it, the defendant, the material and blanks employed by it in the manufacture of gears covered by said patents, guaranteeing to the Eisemann Company deliveries of such material and protection from infringement of plaintiff's patents and from liability by reason of the breach of its contract with the plaintiff; that by reason thereof the Eisemann Company has purchased and is now purchasing its gear material from the defendant, to defendant's great profit; and that defendant has been and now is endeavoring, and threatens to continue to endeavor, to induce others of plaintiff's licensees to violate their license agreements in the same manner, to the irreparable injury of the plaintiff.

The defendant's answer, among other things, sets up the invalidity of the patents; charges that the contract with the Eisemann Company and similar contracts, or at least the portion requiring the licensee to purchase its gear material from the plaintiff exclusively, is in violation of the anti-trust laws of the United States; denies that the defendant induced the Eisemann Company to violate its agreement with the plaintiff; denies that defendant guaranteed the Eisemann Company from liability by reason of any breach of contract with the plaintiff;

and denies that gears made from the materials furnished by the defendant were or are gears covered by the letters patent.

[1] It will be observed that the bill is not a bill under the patent laws, but is a bill to enjoin interference by the defendant with the contract relations of the plaintiff. It would serve no useful purpose to repeat here the history of the doctrine of liability for inducing a breach of contract. Such history is recorded and the development of the doctrine shown in Nims on Unfair Business Competition, c. XIII, pp. 347–387; Elliott on Contracts, vol. 3, §§ 2685–2703; 15 R. C. L. 52–64. The principle of law now obtaining both in this country and in England may be stated to be that a person who induces a party to a contract to break it, intending thereby to injure another person, or to get a benefit for himself, commits an actionable wrong unless there is sufficient justification for the interference. See cases cited in note 20, 15 R. C. L. p. 54. If such interference would result in irreparable injury, equity will take jurisdiction, and by means of its injunction protect a party to the contract from malicious interference with the contract relations by third persons, provided, of course, that such contract is not in violation of law or contrary to public policy. Beekman v. Marsters, 195 Mass. 205, 80 N. E. 817, 11 L. R. A. (N. S.) 201 (and note), 122 Am. St. Rep. 232, 11 Ann. Cas. 332.

The doctrine of interference with contracts is not an outgrowth of the patent law and is in no wise restricted to contracts concerning patents. It is obvious, therefore, that the primary and basic questions necessary to be considered are: What is the contract between the plaintiff and the Eisemann Company? Is it lawful? Was it broken? If broken, was its breach induced by the malicious interference of the defendant? And, lastly, should a preliminary injunction, under all the circumstances of law and fact, be granted or refused? All other questions are secondary and subordinate.

[2] What is the contract between the plaintiff and the Eisemann Company? The express provisions of the contract, so far as they are relevant to the motion under consideration, are as follows:

"Whereas, the licensor is engaged in the manufacture of a composite material adapted for use in the manufacture of gears and is the owner of United States letters patent Nos. 1,167,742 and 1,167,743, dated January 11, 1916, covering gears made from such material; and

"Whereas, the licensor proposes to grant licenses to others (hereinafter referred to as licensed gear material manufacturers) to manufacture and sell said composite material for use in the manufacture of gears; and

"Whereas, the licensee is desirous of acquiring a license to manufacture and use or sell gears made from such composite material and covered by the said patents: * * *

"(a) The licensor hereby gives and grants to the licensee a nonexclusive, nonassignable, and indivisible license, subject to the terms, limitations, and conditions hereinafter set forth, to manufacture and use or sell gears covered by the aforesaid patents throughout the United States, its territories, and dependencies. * * *

"(c) The licensee also covenants to purchase all material or blanks employed by it in the manufacture of gears covered by the said patents exclusively from either the licensor or from licensed gear material manufacturers whose names and addresses shall be supplied to the licensee by the licensor promptly after licenses shall have been granted thereto.

"(d) This license is granted on the express condition that the licensee's

prices, terms, and conditions of sale of gears covered by the aforesaid patents shall be those fixed from time to time and followed by the licensor in making its sales, and the licensee agrees to maintain such prices, terms, and, conditions of sale. * * *

"(f) The licensee admits the validity of and the title of the licensor to the aforesaid patents. * * *"

What gears are "covered by the said patents," within the meaning of paragraph (c) of the contract? Patent No. 1,167,742 relates to gear wheels, and particularly to such wheels as are composed of nonmetallic materials. The materials described in the patent as proper for making such gear wheels is stated in the specification to be:

"Any suitable fabric, such as paper, muslin, or other cloth, or fibrous or porous material of any kind. The fabric is first coated on one side, in any suitable manner, with an adhesive liquid material, for example, preferably a phenolic condensation product, such as bakelite, which is a condensation product of phenols and formaldehyde."

By a process described in the patent the fabric so coated is transformed into a hard, compact, and coherent mass forming the gear blanks. There are 14 claims, of which characteristic claims are:

"1. A self-sustaining gear, composed of fibrous material and a binder."

"3. A gear having a self-sustaining working body portion, composed of laminations of fibrous material and a binder comprising a phenolic condensation product."

"7. A gear having a self-sustaining working body portion composed of fibrous material and a phenolic condensation product."

Patent No. 1,167,743 relates to gear wheels made of cloth fabrics, such as duck, muslin, and the like, united by means of an adhesive. There are five claims, some of which are

"1. A gear having a self-sustaining working body portion composed of laminations of cloth cemented together by means of an adhesive."

"3. A gear having a self-sustaining working body portion composed of laminations of cloth and a phenolic condensation product."

As the Eisemann Company expressly admitted the validity of the patents, any gear coming within the scope of the claims of either of the patents, read in the light of the specifications, is prima facie a gear covered by said patents, and likewise a gear the material for which the Eisemann Company was by paragraph (c) of the contract under covenant to purchase exclusively from the plaintiff or its licensed gear material manufacturers. Whether a gear made of the material purchased by the Eisemann Company from the defendant is such a gear will be hereinafter considered.

Is the contract, or that portion thereof requiring the Eisemann Company to purchase all material or blanks employed by it in the manufacture of "gears covered by the said patents" exclusively from the plaintiff or its licensed gear material manufacturers unlawful or contrary to public policy? Legality of the contract is one of the issues in suits of this nature. Dr. Miles Medical Co. v. Park & Sons Co., 220 U. S. 373, 31 Sup. Ct. 376, 55 L. Ed. 502. The defendant in support of its contention of invalidity relies upon the anti-trust laws of the United States and more particularly upon section 3 of the so-called Clayton Act (38 Stat. 730 [Comp. St. § 8835c]), which provides:

"That it shall be unlawful for any person engaged in commerce, in the course of such commerce, to lease or make a sale or contract for the sale of goods, wares, merchandise, * * * supplies or other commodities, whether patented or unpatented, for use, consumption or resale within the United States or any territory thereof or the District of Columbia or any insular possession or other place under the jurisdiction of the United States, or fix a price charged therefor, or discount from, or rebate upon, such price, on the condition, agreement or understanding that the lessee or purchaser thereof shall not use or deal in the goods, wares, merchandise, machinery, supplies or other commodities of a competitor or competitors of the lessor or seller, where the effect of such lease, sale, or contract for sale or such condition, agreement or understanding may be to substantially lessen competition or tend to create a monopoly in any line of commerce."

It appears from the affidavits that 82 licenses identical in terms and conditions with the license to the Eisemann Company were granted by the plaintiff to gear manufacturers in the United States, and that this number constitutes more than a majority of the gear manufacturers of this country. It likewise appears that gears differing in composition and design, but supplying in whole or in part the want now filled by the Conrad gears, were being made and used in large numbers before the Conrad gears were put upon the market. The plaintiff's license agreement does not contain any condition that the licensee shall not make, use, or deal in the gears of any competitor or competitors of the plaintiff. The license agreement may not, therefore, be held unlawful as tending to create a monopoly in gears. If the Conrad gear has supplanted other gears, as to which there is no evidence, the cause for such supremacy lies outside the contract, and consequently does not bring the contract in conflict with either the statute or public policy.

Again, as the gear material is unpatented, it may be assumed that there was, prior to the grant of the Conrad patents, a "line of commerce" in such material; but, if the patents are valid, only of course for purposes other than for gears. Yet the license agreement contains no condition that the licensee may not make or deal in the materials for use as ingredients of articles other than gears or use or deal in such articles when made. The patents, if valid, added a new use for the material, but left the field of prior uses of the material and of articles other than gears made therefrom unaffected. The license agreement may not, therefore, if the patents are valid, be held unlawful as tending to create a monopoly or to substantially lessen competition in the line of commerce of making, using, or selling articles made of fibrous material and a binder or laminations of cloth, and a phenolic condensation product, and the like, or articles other than gears made from such material. A contrary result would probably follow if the patents are not valid.

But, assuming the patents to be valid, has the manufacture of gears under the Conrad patents created a new "line of commerce" within the meaning of the Clayton Act, namely, the supplying of material for making Conrad gears, and, if so, may the effect of paragraph (c) of the license agreement be to substantially lessen competition or tend to create a monopoly therein? Whether the making and sale of the materials to go into the Conrad gears is a "line of commerce" within the meaning of the Clayton Act is under the evidence before the court

not free from doubt and no opinion will now be expressed thereon. Assuming, however, that that would constitute such "line of commerce," and that the patents are valid, is the contract a lawful one? Revised Statutes, Sec. 4884 (Comp. St. § 9428) provides that:

"Every patent shall contain * * * grant to the patentee, his heirs, or assigns, for the term of 17 years, of the exclusive right to make, use, and vend the invention or discovery throughout the United States and the territories thereof."

A patent gives to the patentee the right, not only to prevent others from making the patented article, but also to prevent others from making any ingredient or part of such patented article with intent that such ingredient or part shall be used in the patented article, for as a patentee may maintain a suit for infringement against a person making such patented article, so may he also maintain a suit for contributory infringement against a person making and selling the ingredients or parts for use in the patented article. The right to make the parts and material entering into the patented article, and to exclude others from making them, if such parts and material are unpatented as in this case, would seem to be an inevitable adjunct of the patent and a part of the patent monopoly. There is no evidence in this case that the patentee or his assignee, the plaintiff, ever surrendered this monopoly to the public. I do not see, therefore, that the effect of granting a license to manufacture the Conrad gears, but reserving to the licensor the right to continue to make the gear material, was to surrender to the public the licensor's monopoly to make the material entering into such gears, or to create a "line of commerce" within the meaning of the Clayton Act.

Nor do I see how the effect of reserving such right to the licensor may be to lessen competition that never existed or tend to create a monopoly that was complete in the licensor before the contract was made. This tentative conclusion is, I think, in accord with Wallace v. Holmes, 9 Blatch. 65, 29 Fed. Cas. 74, and not in conflict with Motion Picture Co. v. Universal Film Co., 243 U. S. 502, 37 Sup. Ct. 416, 61 L. Ed. 871, L. R. A. 1917E, 1187, Ann. Cas. 1918A, 959; for as I understand the latter case the question there decided is radically different from the one now under consideration. Furthermore, the trend of the Motion Picture Company Case is not manifest in U. S. v. United Shoe Mach. Co., 247 U. S. 32, 38 Sup. Ct. 473, 62 L. Ed. 968, and it is not clear that the latter case did not modify the former. It is thus seen that if the making and selling of material for Conrad gears is a "line of commerce," within the meaning of the Clayton Act, which is not decided, that the validity of the contract depends upon the validity of the patents,—not the admission of validity made by the licensee, but upon their actual validity.

[3] Are the patents valid? They have not been adjudicated. There is some evidence of public acquiescence, but probably not sufficient to warrant the issuance of a preliminary injunction, if this were a suit to enjoin infringement of the patents. But while I am not able to find from the evidence that special presumption of validity that lies at the foundation of a patentee's right to a preliminary injunction in an infringement suit, yet I am likewise unable to say from the evidence

that the patents are invalid.  It must be borne in mind that the primary question with which we are now dealing is whether the contract between the plaintiff and the Eisemann Company is illegal and that the question of validity of the patents is subordinate thereto.  If the view of the law as hereinbefore stated is correct, the plaintiff in a suit of this character makes out a prima facie case on the issue of legality of contract by showing that he is the owner of the patent covering the article as to which the license is granted and that the patent is valid on its face.  The defendant here has not denied the ownership of the patents by the plaintiff, but has denied their validity.  This denial is supported by expert testimony, in the form of an ex parte affidavit, referring to certain prior patents, but copies of the prior patents have not been introduced in evidence.  The affidavits also state that vulcanized fiber gears were made for many years before the filing of the Conrad application.  While these affidavits throw some doubt upon the validity of the Conrad patents, I am not prepared to hold that the Conrad patents have thereby been shown to be invalid, or that for the purposes of this motion the presumption of validity of the Eisemann contract has been overcome.

Was the contract broken?  Upon this issue the patents are conclusively presumed to be valid, for, apart from the rule of law which prevents a licensee from disputing the validity of the patent, the Eisemann Company by the license agreement expressly admitted their validity.  Whether the contract was broken depends, therefore, solely upon whether the gears made by the Eisemann Company from material purchased by it from the defendant fall within the scope of the patents.  The superficial vulcanization of the cloth or fiber entering into defendant's gear blanks, which seems to be the main difference between the gear blanks of the defendant and those of the plaintiff, still leaves the defendant's blanks within the scope of the claims of the Conrad patents when read in the light of the specifications.  Whether a thorough investigation of the prior state of the art will show that the claims of the Conrad patents should be limited to the precise materials set forth in the specifications cannot be determined from the ex parte affidavits.

[4]  If the contract was broken, was its breach maliciously induced by the defendant?

"Malice in this form of action does not mean actual malice, or ill will, but consists in the intentional doing of a wrongful act without legal justification or excuse."  Cumberland Glass Mfg. Co. v. De Witt, 120 Md. 381, 87 Atl. 927, Ann. Cas. 1915A, 702.

It appears from the affidavits that the first gear material supplied in quantity to the Eisemann Company by the defendant was on June 25, 1919.  It is not clear from the evidence that the defendant then had knowledge of the contract.  It is clear, however, that after October 30, 1919, the defendant had such knowledge and that it thereafter continued to supply such material.  What is the justification upon which the defendant relies?  It is fourfold, viz.:  The right of competition in trade; that it obtained the original orders for material from the Eisemann Company without improper inducement; that when it ac-

quired knowledge of the plaintiff's contract its relations with the Eisemann Company for supplying gear material had been established; and, lastly, that even if the gears made by the Eisemann Company from the material supplied by the defendant are in law and in fact covered by the Conrad patents, the defendant in good faith believed they were not so covered.

The first two grounds of justification may be considered together. The correspondence between the Eisemann Company and the plaintiff, and between the Eisemann Company and the defendant, shows that for some time prior to June 25, 1919, the defendant was making efforts to sell gear material to the Eisemann Company; that the defendant knew the Eisemann Company was buying its material from the plaintiff, and that it was manufacturing therefrom gears which the plaintiff claimed to be covered by its patents. The necessary inference was that the Eisemann Company was operating under an agreement with the plaintiff. Yet the evidence does not disclose that the defendant made any effort to learn the terms of that agreement, but continued in its efforts to sell gear material to the Eisemann Company and eventually succeeded. What inducement did the defendant offer to the Eisemann Company? Lower prices and the protection set out in the following letter:

"May 9, 1919.

"Eisemann Magneto Company, 32 Bush Terminal Bldg., Brooklyn, N. Y.— Gentlemen: In reference to the matter of purchase of Condensite Celeron chemically treated fabric or paper base, we are willing to accept your orders for gear blanks produced by us in gear blank form, to be machined and cut by you into finished gears for use on magnetos or any other electrical apparatus where it is used as a gear, under the basis that, should the Westinghouse Company interfere legally with you relative to the infringement on their royalty patent which they have on this material, we will protect you in the matter of suit, and accept entire jurisdiction and settlement of such suit by our legal department and financial status in the matter of any action that the Westinghouse Company might bring against you specifically relative to royalty.

"This acceptance is covered by the fact that you intend to use about 100,000 of these gear blanks in your normal production for the year 1919, and our responsibility is limited thereby.

"Very truly yours,          Diamond State Fibre Company,
"JMT.ES                           J. M. Taylor, Vice President."

But apart from this letter I am inclined to agree with the court in Cumberland Glass Mfg. Co. v. De Witt, 120 Md. 381, 87 Atl. 927, Ann. Cas. 1915A, 702, that the right of competition does not justify a person in knowingly and deliberately, for his own benefit or advantage, inducing the breach of a contract by offering lower prices. It is true that it does not appear from the evidence that the defendant had actual knowledge of the contract before June 25, 1919, but it does appear that the defendant had actual knowledge thereof on or about October 30, 1919. So far as is disclosed by the evidence, the inducements were continuing inducements, and there is no evidence that they were withdrawn after October 30th. Under these circumstances, were the sales after October 30th justifiable, even though the defendant's relations had been theretofore established? As I now see it, the continuance of the inducements after knowledge of the contract was not

innocent (Menendez v. Holt, 128 U. S. 514, 523, 9 Sup. Ct. 143, 32 L. Ed. 526), and the previous relations, even if they were innocent, do not furnish a justification for the sales, under like inducements, after October 30th.

If the gears made by the Eisemann Company from the material supplied by the defendant are covered by the Conrad patents, is the defendant entitled to exoneration, if it in good faith believed that such gears were not covered by those patents? As this would not be a valid defense in an infringement suit, it is difficult to see upon what principle such belief would be a sufficient justification for interference with the contract relations of the plaintiff.

[5] Should a preliminary injunction, under the foregoing circumstances, be granted or refused? The general rules of law touching the granting of preliminary injunctions were well stated by Judge Bradford in Harriman v. Northern Securities Co. (C. C.) 132 Fed. 464, 475, thus:

"The granting or refusal of a preliminary injunction, whether mandatory or preventive, calls for the exercise of a sound judicial discretion in view of all the circumstances of the particular case. Regard should be had to the nature of the controversy, the object for which the injunction is sought, and the comparative hardship or convenience to the respective parties involved in the awarding or denial of the injunction. The legitimate object of a preliminary injunction, preventive in its nature, is the preservation of the property or rights in controversy until the decision of the case on a full and final hearing upon the merits, or the dismissal of the bill for want of jurisdiction or other sufficient cause. The injunction is merely provisional. It does not, in a legal sense, finally conclude the rights of parties, whatever may be its practical operation under exceptional circumstances. In a doubtful case, where the granting of the injunction would, on the assumption that the defendant ultimately will prevail, cause greater detriment to him than would, on the contrary assumption, be suffered by the complainant through its refusal, the injunction usually should be denied. But where, in a doubtful case, the denial of the injunction would, on the assumption that the complainant ultimately will prevail, result in greater detriment to him than would on the contrary assumption be sustained by the defendant through its allowance, the injunction usually should be granted. The balance of convenience or hardship ordinarily is a factor of controlling importance in cases of substantial doubt existing at the time of granting or refusing the preliminary injunction. Such doubt may relate either to the facts or to the law of the case, or to both. It may equally attach to, or widely vary in degree as between, the showing of the complainant and that of the defendant, without necessarily being determinative of the propriety of allowing or denying the injunction. Where, for instance, the effect of the injunction would be disastrous to an established and legitimate business through its destruction or interruption in whole or in part, strong and convincing proof of right on the part of the complainant and of the urgency of his case is necessary to justify an exercise of the injunctive power. Where, however, the sole object for which an injunction is sought is the preservation of a fund in controversy, or the maintenance of the status quo, until the question of right between the parties can be decided on final hearing, the injunction properly may be allowed, although there may be serious doubt of the ultimate success of the complainant. Its allowance in the latter case is a provisional measure, of suspensive effect and in aid of such relief, if any, as may finally be decreed to the complainant."

The relations of the Eisemann Company with the plaintiff having already been terminated or suspended, the plaintiff, should it ultimately prevail, would not sustain irreparable injury by a continuance of defendant's relations with the Eisemann Company until final decree. On

the other hand, the interruption of defendant's relations with the Eisemann Company by an injunction pendente lite, if the defendant should ultimately prevail, might result in great detriment to the defendant. But an interference during the pendency of this cause with the contract relations of the plaintiff and its licensees, other than the Eisemann Company, would, should the plaintiff ultimately prevail, result in greater injury and detriment to it than would, on the contrary assumption, be sustained by the defendant through the allowance of the preliminary injunction touching such contracts. As to these contracts I am of the opinion that the status quo should be maintained and a preliminary injunction allowed, but the decree should be so moulded as not to enjoin the defendant from supplying gear material to the Eisemann Company until the further order of the court.

The defendant by its answer set up a counterclaim based upon the alleged unlawfulness of the plaintiff's contracts. The plaintiff filed a motion that the counterclaim be stricken out. This motion and the motion for preliminary injunction were heard together. The questions raised by the motion to strike should not now be finally decided, but should be reserved until after final hearing.

An order denying the motion to strike and a decree for a preliminary injunction in accordance with this opinion may be prepared and submitted.