## MEYER v. WASHINGTON TIMES CO.
### No. 6198.

United States Court of Appeals for the District of Columbia.

Argued Dec. 3, 1934.

Decided March 11, 1935.

GRONER, Associate Justice, dissenting.

J. Harry Covington, Spencer Gordon, George E. Hamilton, John J. Hamilton, George E. Hamilton, Jr., and Henry R. Gower, all of Washington, D. C., for appellant.

Wilton J. Lambert, R. H. Yeatman, and William E. Leahy, all of Washington, D. C., for appellee.

Before MARTIN, Chief Justice, and ROBB, VAN ORSDEL, HITZ, and GRONER, Associate Justices.

VAN ORSDEL, Associate Justice.

Appellant, the Washington Post Publishing Company, plaintiff below, publishes in Washington a morning paper known as the Washington Post; and defendant, the Washington Times Company, publishes a morning paper known as the Washington Herald. This action was brought to restrain defendant from publishing certain features agreed to be furnished by the Chicago Tribune Syndicate & Press Service, Inc., hereafter referred to as the Tribune Company of Chicago, to the plaintiff's predecessor, the Washington Post Company. From a decree dismissing the bill this appeal was taken.

It appears that the Tribune Company entered into a contract on February 9, 1932, to furnish the Washington Post Company with four comic strips for publication: The Gumps, Gasoline Alley, Winnie Winkle, Dick Tracy, and two articles, one by Dr. Evans and one by Westbrook Pegler, for a consideration of $305 per week. On March 25, 1933, a receiver was appointed for the Washington Post Company; and, under an arrangement with the receiver, the Tribune Company continued the service during the period of the receivership. The Post was sold under order of court at a receivership sale to the Washington Post Publishing Company, plaintiff, which sale was ratified on June 12, 1933. On the same date the receiver executed and delivered to plaintiff company a bill of sale for all the assets of the Washington Post Company, among which was its contract with the Tribune Company, and two days later delivered to plaintiff a separate assignment of the contract.

On June 13, 1933, the day after the receiver executed the bill of sale to the plaintiff company, and the day before he specially assigned the contract, the Tribune Company closed a contract with defendant company to furnish them, exclusively after July 15, 1933, the features involved in the Post Company contract. Plaintiff, by letters of June 17 and 24, 1933, addressed to the Tribune Company and the Chicago Tribune Syndicate & Press Service, Inc., insisted on the performance of its contract, and tendered payment in cash for the features without taking advantage of the credit allowed by the terms of the contract. The Tribune Company, however, ignored its contract with plaintiff, and defendant insisted on its right under its contract to publish the features.

On July 12, 1933, plaintiff brought the present suit for injunction to restrain defendant from interfering with its contract. A temporary restraining order was issued, which was subsequently dissolved by the final order from which this appeal was taken. Plaintiff also instituted in the Supreme Court of New York a suit against the Tribune Company and the Chicago Tribune Syndicate & Press Service, Inc., for specific performance of the contract of February 9, 1932, in which a permanent injunction was obtained. 240 App. Div. 960, 268 N. Y. S. 883. Later the case came to trial upon its merits before the Supreme Court of New York, where it was held that the con-

tract was assignable and had passed to the plaintiff at the receiver's sale, and that plaintiff was entitled to a decree for specific performance of the contract. New York Law Journal of July 13, 1934, p. 118.

Among its conclusions of law, the court found as follows: "(1) The contract referred to in the complaint was assignable. (2) Said contract was included in the property directed to be sold by the decree of the Supreme Court of the District of Columbia, and was embraced in the bill of sale to this plaintiff. (3) The provision in said contract for the extension of credit did not prevent its assignment to or its enforcement by the plaintiff, in view of plaintiff's offer to pay cash. (4) At the time of said assignment, the contract had not been terminated and was in full force and effect."

The court below, in the present case, reached a different opinion than that rendered by the New York courts, holding that the contract was not assignable, and that it was not included in the property directed to be sold by the receiver, or embraced in the bill of sale from the receiver to appellant company; with a further additional reason for its decision, which was not involved in the New York case, to the effect that defendant company was not aware at the time it entered into its contract that plaintiff's contract was still in force. On this point it claims to have relied upon an opinion of counsel to the effect that the contract was not assignable and could be regarded as terminated by the Tribune Company. In other respects, the facts in this case are not different from those adduced in the New York case.

We agree with the holding of the New York court that the contract in the present case was assignable. As said by Mr. Justice Schmuck: "The contract is assignable unless of a personal character, as a promise to marry, or one requiring skill, science, or peculiar qualifications. The contract here considered requiring on the one hand forwarding of matrices and on the other use of ordinary mechanical appliances, for the purpose of manifold reproduction, cannot be said to call into play other than knowledge of the use of ordinary implements. Viewed from every angle, even with prejudiced eyes, this contract cannot be tagged as nonassignable. Considering the credit feature of the agreement, a like conclusion is reached. In re Niagara Radiator Co. (D. C.) 164 F. 102, it was held that if nonassignability is not inhibited, the credit ex-

tending to the vendee does not make it so, provided the assignee is ready to pay cash."

It is insisted, however, that this is not strictly a contract but in the nature of a license to use and publish copyrighted material. Whatever may be the effect of such a license between the Tribune Company and the artists producing the comics in question may be disregarded, since the contract involved is not with the artists but with the Tribune Company for the sale of the merchandise to one of its customers. There is nothing in the terms of the contract to forbid its assignment, nor is the contract of such a personal character as to prevent it from passing under the circumstances and terms of the receivership sale. There is nothing in this contract requiring the exercise of skill or peculiar qualifications on the part of the Post Company. It was merely a contract in the form employed by the Tribune Company in furnishing these comics to a multitude of publishers throughout the country. It amounted merely to one instance of a general series of transactions, divesting the contract of every element of nonassignability.

The test of assignability is well stated in Devlin v. Mayor, 63 N. Y. 8, 17, as follows: "The assignability of a contract must depend upon the nature of the contract and the character of the obligations assumed rather than the supposed intent of the parties, except as that intent is expressed in the agreement. Parties may, in terms, prohibit the assignment of any contract and declare that neither personal representatives nor assignees shall succeed to any rights in virtue of it, or be bound by its obligations. But when this has not been declared expressly or by implication, contracts other than such as are personal in their character, as promises to marry or engagements for personal services requiring skill, science or peculiar qualifications, may be assigned."

The contract here was in substance an agreement by the Chicago Tribune to furnish the Washington Post with certain comics and features, and the assignment, or rather sale of the contract, to plaintiff company was not a transfer of the contract rights to another and independent publication. It merely meant the continuation of the same publication. This distinction is emphasized in a leading English case, Talhurst v. Associated Portland Cement Manufacturers et al., [1903] A. C. 414, where the contract was by an owner of a quarry to supply chalk to be used by a nearby cement

plant. The cement plant was later taken over by a new company, and, while it was held that the contract would not be assignable to another cement plant, the judges in the House of Lords held in effect that the contract was for the quarry to supply that particular cement works, and it made no difference to the owner of the quarry who owned or operated the cement works. The assignment was accordingly upheld.

In this case, as we have stated, the contract was with the Washington Post Company to publish these comics in the Washington Post, and it makes no difference to the Tribune Company whether it was published in that paper by the original company with which it contracted or plaintiff company. In Dunkley Co. v. California Packing Corporation (D. C.) 277 F. 989, 992, Judge Augustus Hand, in considering a case where, as in the present instance, a successor bought the entire business of the licensee, said: "The federal courts have treated situations like the present in a broad way and have allowed corporations succeeding to the business of a licensee to succeed to the license where the particular circumstances of the case warranted such a result."

■ The facts disclosed by the record in this case clearly establish the transfer of the contract as a part of the receivership sale. By the order appointing the receiver he was authorized "to consider and determine which of the contracts, leases, or other contractual arrangements between defendant, The Washington Post Company, and any and all other persons or corporations that he will renounce or adopt."

Promptly upon assuming his duties, the receiver wrote the Tribune Company as follows: "I beg to inform you that I was appointed receiver of The Washington Post Company by decree of the Supreme Court of the District of Columbia, passed on March 25, 1933, in equity case no. 55485, with authority to continue, manage, and operate the business of the corporation until the further order of the court. Acting under the authority conferred upon me by said decree, and without adopting or renouncing the existing contract between you and said corporation, you are hereby notified that I, as such receiver, desire to have you continue the service furnished by you to The Washington Post Company at the time and prior to my appointment as such receiver, such arrangement to continue during the period of my receivership, or until further notice by me."

It will be observed by this letter that the receiver neither affirmed nor renounced the contract. This left the matter of affirmative action between the receiver and the Tribune Company with the company. If it was not satisfied to accept the proposition of the receiver, it could have applied to the court to compel an election on the part of the receiver, whether he would continue the contract or not. Samuels v. E. F. Drew & Co. (D. C.) 286 F. 278; Menke v. Willcox (D. C.) 275 F. 57; Universal Rim Co. v. Scott (D. C.) 21 F.(2d) 346.

The failure of the Tribune Company to object amounted to a concurrence in the proposition of the receiver, and in accordance with this understanding the publication of the materials under the contract was continued during the entire receivership, and was in full force and effect at the time of the sale. The court, in ordering the sale, directed the receiver to sell at public auction the Washington Post, the good will of the Washington Post Company, and all assets of said company of every kind, character, and description, except cash. Considering the contract still in force by the acceptance of the proposition of the receiver by the Tribune Company, it was an asset of the Washington Post Company which was capable of being sold at the receivership sale and conveyed to the purchaser by the receiver.

Immediately following the sale, in a letter dated June 3, 1933, the receiver notified the Tribune Company of the sale, and in the letter stated: "I believe that it is the intention of the purchaser to continue your service, and that such purchaser will most likely desire to enter into a contract with you with respect thereto." And on June 9 the receiver, after he had talked with the agent of the undisclosed purchaser of the Washington Post, wrote the Tribune Company that he had been advised by the agent, the lawyer for the purchaser, that: "It is the purpose of his clients to carry on the publication of The Post, using the features and services of your company; and that as soon as possible after the transfer of the paper they will get in touch with you with a view of making arrangements for the continuation of your features." This was followed by the confirmation of the sale and the execution of the proper conveyance of the property, including this contract, to the purchaser, the Washington Post Publishing Company. All of these notices were in the possession of the Tribune Company at the time it entered into its contract with the defendant

company; and the evidence clearly discloses that defendant company had full notice of the sale and the terms of the sale when it entered into its contract with the Tribune Company.

■ The evidence likewise discloses that it was a trade custom of the Tribune Company to give the exclusive right to publish the features in the city or community where the paper of the licensee or contractee was published. The court below, in its findings of fact, found as follows: "There is a uniform custom in the business of selling syndicated features to newspapers that the purpose of a syndicated feature gives the exclusive right to publish that feature in the city in which the newspaper appears. The Tribune Company, and The Chicago Tribune Syndicate & Press Service, Inc., have in their business at all times followed the custom of allowing only one newspaper in a city to have a syndicated feature."

This finding is clearly supported by the testimony. It was not only the understanding between the parties when the contract of February 9, 1932, was entered into, but it was also the understanding when the contract was made between the Tribune Company and defendant company. In view of its own testimony on this subject, defendant company is in poor position to advance this issue. The ancient theory that evidence of usage is inadmissible to vary the terms of a contract has been generally discarded by the courts of both England and this country. Renner v. Bank of Columbia, 9 Wheat. 581, 6 L. Ed. 166; Lillard v. Kentucky Distilleries & Warehouse Co. (C. C. A.) 134 F. 168; Nicoll v. Pittsvein Coal Company (C. C. A.) 269 F. 968; Humphrey v. Dale, 7 El. & Bl. 266; Parker v. Ibbetson, 4 Cb. (N. S.) 346; McDonald Com. Co. v. Union Hay Company, 143 Minn. 40, 172 N. W. 891; Prysi v. Kinsey, 38 Ohio App. 92, 175 N. E. 707.

■ We come now to the consideration of the final question as to whether or not plaintiff company is entitled to equitable relief. We think the evidence clearly discloses that at the time the Chicago Tribune Syndicate & Press Service, Inc., the subsidiary of the Tribune Company, entered into its contract with defendant company, which was inconsistent with its contract with plaintiff company's predecessor, that defendant company had full knowledge of the existence of a prior contract with the Post Company, of the terms of the sale, and that the Post Company contract was embraced within the property sold and conveyed by the receiver.

All that the law requires as essential to establish intentional action on the part of the defendant company to act in a manner which would induce the breach of plaintiff's contract is a knowledge of the contract rights of the plaintiff, and that plaintiff's contract was still in effect. The Tribune Company's excuse that it acted upon the advice of its counsel, to the effect that its contract with the Post Company was no longer in force, furnishes no excuse to defendant company. Defendant company possessed knowledge sufficient to legally restrain it from entering into any arrangement with the Tribune Company that would induce a breach of its contract with the Post Company.

Nor is it necessary for plaintiff to establish that defendant's action was based upon malice, ill will, fraud, or conspiracy, to entitle it to equitable relief. "The act is malicious when the thing done is with the knowledge of plaintiff's rights, and with the intent to interfere therewith. In a legal sense it means a wrongful act, done intentionally, without just cause or excuse. Mogul Steamship Co. v. McGregor, 23 Q. B. D. 598. It does not mean actual malice or ill will, but consists in the intentional doing of a wrongful act without legal justification. Cumberland Glass Mfg. Co. v. DeWitt, supra [120 Md. 381, 387, 392, 87 A. 927, Ann. Cas. 1915A, 702]. The gist of the action is not the intent to injure, but to interfere without justification with plaintiff's contractual rights with knowledge thereof." Lamb v. S. Cheney & Son, 227 N. Y. 418, 125 N. E. 817, 818.

While in one sense this may be called a tort, it is a continuing transaction, and one that could not be compensated in damages, and where protection can only be afforded through the interposition of equity. The rule in cases of this sort is clearly expressed in E. L. Husting Co. v. Coca Cola Co., 205 Wis. 356, 237 N. W. 85, 88, 238 N. W. 626, 84 A. L. R. 22, as follows: "Where the situation is such that the legal remedy of damages is for any reason inadequate, equity will enjoin such interference by a third party. This doctrine had its inception with the case of Lumley v. Gye, 2 Ellis & Bl. 216. The doctrine of that case, which was limited to malicious interference with contracts for personal service, has been followed and extended by numerous other cases. It now extends to contracts other than those involving

personal services, and the definition of 'malice' has been broadened to include unjustified interference with the contractual relationship."

■ Defendant's reliance upon the legal opinion procured by the Tribune Company from its counsel, to the effect that the contract with the Post Company was nonassignable, furnishes no excuse for inducing or participating in the breach of the contract. In the Coca Cola Case, defendant relied upon a defense that the contract was entered into only after legal advice was received to the effect that the plaintiff's contract was of no further force and effect. The court granted an injunction and held that this constituted no defense, and in support of its holding quoted from McLennan v. Church, 163 Wis. 411, 158 N. W. 73 as follows: "Curby knew when he negotiated with the Churches and dealt with them that plaintiff held the contract in question, and knew all the circumstances requisite to charge him with knowledge that such contract had not lapsed. The fact that he did not know the legal effect of such circumstances, and ignorantly supposed that a mere default of appellant terminated his contract rights, and in that state of mind dealt with the Churches, may relieve him from any taint of moral turpitude, but not of remedial responsibility. Fraud in law is remediable as well as fraud in fact."

■ As we have suggested, the damage here that would be sustained by the appellant company is irreparable and irremediable if continued, and the law furnishes neither a complete nor adequate remedy. In such cases injunction will lie to restrain a third party from interfering with existing contract relations. "If such interference would result in irreparable injury, equity will take jurisdiction, and by means of its injunction protect a party to the contract from malicious interference with the contract relations by third persons, provided, of course, that such contract is not in violation of law or contrary to public policy." Westinghouse Electric & Mfg. Co. v. Diamond State Fibre Co. (D. C.) 268 F. 121, 123.

The dismissal of the petition for an injunction in this case left both plaintiff and defendant publishing the comics in their respective papers; plaintiff company is acting under protection of the decree for specific performance entered by the New York court, and defendant company is operating under its contract. An injunction decree to restrain defendant company from further operating under its contract with the Tribune Company will leave in full force the decree of the New York court requiring the Tribune Company to perform its contract with appellant company.

The decree is reversed, with costs, and the cause is remanded for further proceedings not inconsistent with this opinion.

GRONER, Associate Justice (dissenting).

The trouble I have in agreeing with the conclusion reached in this case grows out of the incidents which occurred between the time of the appointment of the receiver of the Washington Post and the sale by the receiver of its assets to appellant. A concise statement of these is as follows:

On March 25, 1933, a suit was instituted in the Supreme Court of the District of Columbia, for the appointment of a receiver of the Washington Post Company, and on that date Benjamin S. Minor, Esquire, was appointed and qualified. The order appointing him is not in the record, but enough appears to show that the receiver was authorized to conduct the newspaper, and this he did until the sale to appellant. At the time of Mr. Minor's appointment there was in existence a contract dated February 9, 1932, between the Chicago Tribune Syndicate and Press Service, Inc., and the Washington Post Company, by which the Tribune agreed to furnish the Post certain comic strips for publication in that newspaper. That is the contract involved in this suit.

On April 12, 1933, Mr. Minor wrote the Tribune at Chicago as follows:

"I beg to inform you that I was appointed receiver of The Washington Post Company by decree of the Supreme Court of the District of Columbia passed on March 25, 1933, in equity cause no. 55485, with authority to continue, manage, and operate the business of the corporation until the further order of the Court.

"Acting under the authority conferred upon me by said decree, and without adopting or renouncing the existing contract between you and said corporation, you are hereby notified that I, as such receiver, desire to have you continue the service furnished by you to The Washington Post Company at the time and prior to my appointment as such receiver. Such arrangement to continue during the period of my receivership or until further notice by me."

I can find in the record no answer to this communication, but it is a fact that there-

after, and until the transfer of the assets of the Post, the Tribune continued to furnish the "features" provided for by the contract of February 9, 1932, billing the receiver monthly on the basis of the price stipulated in the contract.

On June 1, 1933, the receiver conducted a sale of the assets, and on June 5 reported the sale to the court. On June 12 the sale was ratified and confirmed, and thereupon the receiver and the company jointly and severally assigned, transferred, and conveyed to appellant all the properties of the Post. Under date of June 3, Mr. Minor wrote the Tribune, in reply to an inquiry by it, as follows: "Of course, I desire you to continue your service to me as receiver and I shall advise you promptly when the transfer is made. I believe that it is the intention of the purchaser to continue your service and that such purchaser will most likely desire to enter into a contract with you with respect thereto within a reasonable time after obtaining possession."

And again on June 9 Mr. Minor wrote:

"After talking with you over the phone this morning I saw the representative of the recent purchaser or purchasers of The Washington Post and he advises me that it is the purpose of his clients to carry on the publication of the Post, using the features and services of your company; and that as soon as possible after the transfer of the paper they will get in touch with you with a view of making arrangements for the continuation of your features.

"As I told you over the phone, I think that the new purchaser should be given a reasonable time within which to make arrangements to continue your service."

In addition to the main bill of sale conveying the Post assets, the receiver on June 14, by a separate paper, expressly assigned the contract here in issue to appellant. After the transfer to appellant, it shortly thereafter notified the Tribune that it expected compliance on its part with its contract with the former Post Company.

The question, in these circumstances, is whether the contract of the Tribune with the old company continued in effect throughout the receivership and passed with the assets at the sale. I am in accord with the view of the court that the contract was assignable, if in existence when the assets of the Post were sold; but I am in disagreement with the conclusion that the contract survived and was transferable at the time of the sale. The conclusion I reach is that the contract, being assignable, passed to the receiver on his appointment, subject, however, to an obligation on his part either to adopt it or to rescind it within a reasonable time. So far as the record discloses, there was no order of court in relation to the contract. In this aspect, in order that it should be kept alive and effective, it was the duty of the receiver affirmatively to elect to carry out its terms. If the contract was onerous, the receiver was not bound to adopt it. If it was profitable, he could elect to assume the obligations which it imposed and demand compliance by the Tribune, but, without action on his part, affirmative or negative, the contract, by virtue of the insolvency and inability of the Post Company to comply with its terms, came to an end. In Sunflower Oil Co. v. Wilson, 142 U. S. 313, 322, 12 S. Ct. 235, 237, 35 L. Ed. 1025, it is said: "The receiver did not simply by virtue of his appointment, become liable upon the covenants and agreements of the railway company. High, Rec. § 273; Hoyt v. Stoddard, 2 Allen [Mass.] 442. Upon taking possession of the property, he was entitled to a reasonable time to elect whether he would adopt this contract and make it his own, or whether he would insist upon the inability of the company to pay, and return the property in good order and condition; paying, of course, the stipulated rental for it so long as he used it. Turner v. Richardson, 7 East, 335; Com. v. Franklin Ins. Co., 115 Mass. 278; Sparhawk v. Yerkes [142 U. S. 1], 12 S. Ct. 104 [35 L. Ed. 915]."

The action of the receiver in continuing to use the service, under the terms of his letter, would not create equitable estoppel against appellant as purchaser, or prejudice its right to repudiate the contract; nor was the receiver's action in requesting a continuation of the service for his benefit as receiver such an affirmative election as bound the Tribune Company under the contract, either to him or to the purchaser of the Post. He declined to adopt the contract, and he also declined to renounce it, but the effect of what he did was practically to put an end to it. That he recognized this is shown by the terms of his letter, which are only consistent with an application to the Tribune to provide the comic features under an independent agreement with himself, limited to the period of the receivership. In this view, as I think, the original contract was at an end, and when the sale was had the receiver, so far as the contract is concerned, had nothing to assign. This conclusion seems to me to follow the rule announced in Central

Trust Co. of Ill. v. Chicago Auditorium Association, 240 U. S. 581, 36 S. Ct. 412, 60 L. Ed. 811. At page 590 of 240 U. S., 36 S. Ct. 414, Justice Pitney says: "The immediate effect of bankruptcy was to strip the company of its assets, and thus disable it from performing. It may be conceded that the contract was assignable, and passed to the trustee under section 70a (30 Stat. at L. 565, chap. 541, Comp. Stat. 1913, § 9654 [11 USCA § 110 (a)]), to the extent that it had an option to perform it in the place of the bankrupt (see Sparhawk v. Yerkes, 142 U. S. 1, 13, 35 L. Ed. 915, 918, 12 S. Ct. 104; Sunflower Oil Co. v. Wilson, 142 U. S. 313, 322, 35 L. Ed. 1025, 1028, 12 S. Ct. 235); for although there was a stipulation against assignment without consent of the Auditorium Association, it may be assumed that this did not prevent an assignment by operation of law. Still, the trustee in bankruptcy did not elect to assume performance, and so the matter is left as if the law had conferred no such election."

My opinion is the decree below should be affirmed.