The **EVENING NEWS ASSOCIATION,** d/b/a the Evening News Association, Inc., Licensee of Station WDVM–TV, Plaintiff,

v.

Gordon **PETERSON,** Defendant.

Civ. A. No. 79–2068.

United States District Court, District of Columbia.

Sept. 7, 1979.

Gordon W. Hatheway, Jr., William O. Bittman, James K. Jackson, Pierson, Ball & Dowd, Washington, D. C., for plaintiff.

Daniel B. Jordan, Cafferky, Powers, Jordan & Lewis, Washington, D. C., Howard L. Ganz, New York City, Proskauer, Rose, Goetz & Mendelsohn, Washington, D. C., for defendant.

MEMORANDUM OPINION

BARRINGTON D. PARKER, District Judge:

The question presented in this litigation is whether a contract of employment between an employee and the owner and licensee of a television station, providing for the employee's services as a newscaster-anchorman, was assigned when the station was sold and acquired by a new owner and licensee.

Plaintiff Evening News Association (Evening News) a Michigan Corporation, acquired station WDVM–TV (Channel 9) a District of Columbia television station from Post-Newsweek Stations, Inc. (Post-Newsweek) in June of 1978. At that time, the defendant Gordon Peterson was and had been employed for several years as a newscaster-anchorman by Post-Newsweek. This defendant is a citizen of the State of Maryland. The plaintiff claims that Peterson's employment contract was assignable with-

out the latter's consent, was indeed assigned, and thus otherwise enforceable. The defendant contends, however, that his Post-Newsweek contract required him to perform unique and unusual services and because of the personal relationship he had with Post-Newsweek the contract was not assignable.

Mr. Peterson was employed by the plaintiff for more than one year after the acquisition and received the compensation and all benefits provided by the Post-Newsweek contract. In early August, 1979, he tendered his resignation to the plaintiff. At that time the defendant had negotiated an employment contract with a third television station located in the District of Columbia, a competitor of the plaintiff. The Evening News then sued Peterson, seeking a declaration of the rights and legal relations of the parties under the contract and permanent injunctive relief against the defendant.

Following an accelerated briefing schedule and an expedited bench trial on the merits, the Court concludes that the contract was assignable and that Evening News is entitled to appropriate permanent injunctive relief against the defendant Gordon Peterson.

In accordance with Rule 52(a) Fed.R. Civ.P., the Court's findings of fact and conclusions of law in support of that determination are set forth.

## FINDINGS OF FACT

The defendant was employed by Post-Newsweek Stations, Inc. from 1969 to 1978. During that period he negotiated several employment contracts. Post-Newsweek had a license to operate television station WTOP–TV (Channel 9) in the District of Columbia. In June of 1978, following approval by the Federal Communications Commission, Post-Newsweek sold its operating license to Evening News and Channel 9 was then designated WDVM–TV. A June 26, 1978, Bill of Sale and Assignment

and Instrument of Assumption and Indemnity between the two provided in pertinent part:

> PNS has granted, bargained, sold, conveyed and assigned to ENA, . . . all the property of PNS . . . including, . . . all right, title and interest, legal or equitable, of PNS in, to and under all agreements, contracts and commitments listed in Schedule A hereto. . . . [1]

When Evening News acquired the station, Peterson's Post-Newsweek employment contract, dated July 1, 1977, was included in the Bill of Sale and Assignment.[2] The contract was for a three-year term ending June 30, 1980, and could be extended for two additional one-year terms, at the option of Post-Newsweek. The significant and relevant duties and obligations under that contract required Peterson:

> to render services as a news anchorman, and to perform such related services as news gathering, writing and reporting, and the organization and preparation of program material, to the extent required by the Stations, as are consistent with [his] primary responsibility as a news anchorman. . . . [To participate] personally as a newsman, announcer, on-the-air personality or other performer in any news, public affairs, documentary, news analysis, interview, special events or other program or segment of any program, designated by . . . and to the extent required by the Stations . . . as may reasonably be required by the Stations. . . . [3]

As compensation the defendant was to receive a designated salary which increased each year from 1977 through the fifth (option) year. Post-Newsweek was also obligated to provide additional benefits including term life insurance valued at his 1977 base salary, disability insurance, an annual clothing allowance and benefits to which he was entitled as provided in an underlying collective bargaining agreement with the

---

1. Plaintiff Ex. 2, ¶ 1.

2. Plaintiff Ex. 2, Schedule A, Group 3, No. 5.

3. Plaintiff Ex. 1, ¶ 1.

American Federation of Television and Radio Artists.[4]

There was no express provision in the 1977 contract concerning its assignability or nonassignability. However, it contained the following integration clause:

> This agreement contains the entire understanding of the parties . . . and this agreement cannot be altered or modified except in a writing signed by both parties.[5]

### A.

Aside from the various undisputed documents and exhibits admitted into evidence, there were sharp conflicts in testimony concerning various events and what was said and done by the parties and their representatives, both before and after the Evening News' acquisition. As trier of fact, having heard and seen the several witnesses testify and after assessing and determining their credibility, the Court makes the following additional findings.

The defendant's duties, obligations and performance under the 1977 contract did not change in any significant way after the Evening News' acquisition. In addition, the Evening News met all of its required contract obligations to the defendant and its performance after acquisition in June, 1978, was not materially different from that of Post-Newsweek.

Mr. Peterson testified that he had "almost a family relationship" with James Snyder, News Director, and John Baker, Executive Producer, for Post-Newsweek, which permitted and promoted a free exchange of ideas, frank expressions of dissent and criticism and open lines of communication. These men left Channel 9 when Post-Newsweek relinquished its license, and they have since been replaced by Evening News personnel. According to Mr. Peterson, the close relationship and rapport which existed between him and them was an important factor as he viewed the contract; these relationships made the contract in his view nonassignable and indeed their

absence at the Evening News prevented defendant from contributing his full efforts. Even if Mr. Peterson's contentions are accepted, it should be noted that he contracted with the Post-Newsweek corporation and not with the News Director and Executive Producer of that corporation. Indeed, the 1977 contract makes no reference to either officer, except to provide that vacations should be scheduled and coordinated through the News Director. Had the defendant intended to condition his performance on his continued ability to work with Snyder and Baker, one would have expected the contract to reflect that condition.

The close, intimate and personal relationship which Mr. Peterson points to as characterizing his association with Post-Newsweek and its personnel, was highly subjective and was supported only by his testimony. The Court cannot find that Peterson contracted with Post-Newsweek in 1977 to work with particular individuals or because of a special policy-making role he had been selected to perform in the newsroom. For the fourteen-month period of Peterson's employment at the Evening News, there is no showing that he was in any way circumscribed, limited in his work or otherwise disadvantaged in his performance. Nor is there any credible evidence that the News Director or other top personnel of Evening News were rigid, inflexible, warded off any of Mr. Peterson's criticisms or even that at any time he gave suggestions and criticisms which were ignored or rejected. Finally, the Court does not find that Post-Newsweek contracted with Peterson because of any peculiarly unique qualities or because of a relationship of personal confidence with him.

### B.

In his direct testimony, Mr. Peterson expressed a degree of disappointment because of Evening News' failure to keep apace with advances in technology and to seize

---

4. Plaintiff Ex. 1A.

5. Plaintiff Ex. 1, ¶ 13.

opportunities for live in-depth coverage of current events. He characterized the plaintiff's news coverage as "less aggressive" than what he had experienced with Post-Newsweek.

On cross-examination, however, he was shown an exhibit[6] comparing the broadcast of special assignments reported and produced by him for two one-year periods, one before and one after the June, 1978 acquisition. While he admitted to its accuracy with some reservation, the exhibit clearly showed that a comparable number of such assignments of similar quality, were broadcast within the two years. He also conceded that for the same period Evening News received two Peabody awards, an award for best editorials, and a number of Emmy awards for public affairs exceeding those received in prior years by Post-Newsweek. Finally, he acknowledged that Channel 9 still maintained the highest ratings for audience viewing among the television stations in the Washington, D.C. market area.[7]

A great amount of testimony was generated as to when Peterson learned of the Evening News' acquisition and what then occurred relative to the assignment of the contract. The testimony on this issue was conflicting, largely cumulative and as now viewed, over-emphasized by the parties. The Court finds that the defendant gained first knowledge of a possible sale and transfer of the station in December, 1977. At that time, the president of Post-Newsweek publicly announced to the station's employees, including Peterson, that an agreement in principle had been reached, subject to approval by the Federal Communications Commission. At no time from December, 1977, until December, 1978, did the defendant or his attorney ever indicate or venture an opinion that the contract was not assignable. Indeed, through at least April, 1979, the defendant's attorney made representations that assignment of the contract presented no problem to his client.

In summary, the Court finds that the performance required of Mr. Peterson un-

der the 1977 contract was (1) not based upon a personal relationship or one of special confidence between him and Post-Newsweek or its employees, and (2) was not changed in any material way by the assignment to the Evening News.

## CONCLUSIONS OF LAW

There is diversity of citizenship; the amount in controversy exceeds $10,000; and the Court has jurisdiction over this proceeding by virtue of 28 U.S.C. § 1332.

### A.

The distinction between the assignment of a right to receive services and the obligation to provide them is critical in this proceeding. This is so because duties under a personal services contract involving special skill or ability are generally not delegable by the one obligated to perform, absent the consent of the other party. The issue, however, is not whether the personal services Peterson is to perform are delegable but whether Post-Newsweek's right to receive them is assignable.

Contract rights as a general rule are assignable. *Munchak Corp. v. Cunningham,* 457 F.2d 721 (4th Cir. 1972); *Meyer v. Washington Times Co.,* 64 App.D.C. 218, 76 F.2d 988 (D.C.Cir.) *cert. denied* 295 U.S. 734, 55 S.Ct. 646, 79 L.Ed. 1682 (1935); 4 A. Corbin, Contracts § 865 (1951); Restatement (First) of Contracts § 151 (1932). This rule, however, is subject to exception where the assignment would vary materially the duty of the obligor, increase materially the burden of risk imposed by the contract, or impair materially the obligor's chance of obtaining return performance. Corbin § 868; Restatement § 152. There has been no showing, however, that the services required of Peterson by the Post-Newsweek contract have changed in any material way since the Evening News entered the picture. Both before and after, he anchored the same news programs. Similarly he has had essentially the same

---

**6.** Plaintiff Ex. 9.

**7.** Plaintiff Ex. 8.

number of special assignments since the transfer as before. Any additional policy-making role that he formerly enjoyed and is now denied was neither a condition of his contract nor factually supported by other than his own subjective testimony.

The general rule of assignability is also subject to exception where the contract calls for the rendition of personal services based on a relationship of confidence between the parties. *Munchak*, 457 F.2d at 725; *Meyer*, 64 App.D.C. at 219, 76 F.2d at 989. As Corbin has explained this limitation on assignment:

> In almost all cases where a "contract" is said to be non-assignable because it is "personal," what is meant is not that the contractor's right is not assignable, but that the performance required by his duty is a personal performance and that an attempt to perform by a substituted person would not discharge the contractor's duty.

Corbin § 865. In *Munchak*, the Court concluded that a basketball player's personal services contract could be assigned by the owner of the club to a new owner, despite a contractual prohibition on assignment to another club, on the basis that the services were to the club. The Court found it "inconceivable" that the player's services "could be affected by the personalities of successive corporate owners." 457 F.2d at 725. The policy against the assignment of personal service contracts, as the Court noted, "is to prohibit an assignment of a contract in which the obligor undertakes to serve only the original obligee." 457 F.2d at 726.

Given the silence of the contract on assignability, its merger clause, and the usual rule that contract rights are assignable, the Court cannot but conclude on the facts of this case that defendant's contract was assignable. Mr. Peterson's contract with Post-Newsweek gives no hint that he was to perform as other than a newscaster-anchorman for their stations. Nor is there any hint that he was to work with particular Post-Newsweek employees or was assured a policy-making role in concert with

any given employees. Defendant's employer was a corporation, and it was for Post-Newsweek Stations, Inc. that he contracted to perform. The corporation's duties under the contract did not involve the rendition of personal services to defendant; essentially they were to compensate him. Nor does the contract give any suggestion of a relation of special confidence between the two or that defendant was expected to serve the Post-Newsweek stations only so long as the latter had the license for them.

## B.

As noted, the 1977 contract contained a clause providing that the entire understanding between the parties was contained within the four corners of the agreement. The contract contains no provision relating to assignment. The defendant's counsel asserts, however, that an ambiguity exists and he therefore seeks to introduce certain exhibits and other extrinsic evidence for purposes of explaining and discerning the intentions of the parties. Specifically, he seeks to introduce four documents: an earlier 1973 contract; a draft of a proposed 1974 contract; the final 1974 contract; and a letter of 1975 from the president of Post-Newsweek to the defendant. The Court reserved decision on admissibility of the exhibits and now rules that they are inadmissible for the purposes intended by the defendant. The 1977 contract makes no reference to any prior agreements, to any negotiations between the parties, or specifically to the four proffered exhibits. To make use of them to show the intention of the parties in 1977, or to show what happened in past contract negotiations, simply asks too much.

The Court does not share the defendant's belief that silence on the issue of assignability creates ambiguity, and he fails to provide any legal authority to warrant such an inference. An unsupported assertion that ambiguity exists is insufficient to give a different meaning to a contract when there is in fact no contractual provision. For the Court to accept the defendant's exhibits in an effort to explain the parties' intent

would modify and enlarge the provisions of the agreement and bestow upon the defendant an advantage which he did not originally have. The law of this Circuit is clearly set forth in *Clayman v. Goodman Properties, Inc.*, 171 U.S.App.D.C. 88, 95, 518 F.2d 1026, 1033 (D.C.Cir. 1973), where Circuit Judge Robinson said in part:

> [W]e perceive no basis for resort to evidence depicting the circumstances surrounding the making of the contract before us. We need do little more than reiterate that "[t]he parol evidence rule requires that '[w]hen two parties have made a contract and have expressed it in a writing to which they have both assented as the complete and accurate integration of that contract, evidence, whether parol or otherwise, of antecedent understandings and negotiations will not be admitted for the purpose of varying or contradicting the writing.'" The consequences which the law attaches to a written contract are as much a part of it as the terms it sets forth, and the legal effect of the contract can no more be changed or modified by parol evidence than it could have had it been made express.

The contract before the Court, as the agreement in *Clayman*, contains a merger clause stating that the contract embodies the final and exclusive understanding of the parties. Such a stipulation is given full effect in this jurisdiction absent the Court's finding of any ambiguity in the contract. *Lee v. Flintkote Co.*, 193 U.S.App.D.C. 121, 127, 593 F.2d 1275, 1281 (D.C.Cir. 1979).

### C.

Plaintiff's argument that defendant has waived any objection to the assignment by accepting the contract benefits and continuing to perform for the Evening News for over a year has perhaps some merit. If defendant has doubts about assignability, he should have voiced them when he learned of the planned transfer or at least at the time of transfer. His continued performance without reservation followed by the unanticipated tender of his resignation did disadvantage Evening News in terms of finding a possible replacement for him and possibly in lost revenues. The Court, however, concludes that the contract was assignable in the first instance and thus it is not necessary to determine whether defendant's continued performance constitutes a waiver of objection to the assignment.

During the course of this trial Edwin W. Pfeiffer, an executive officer of WDVM–TV, testified that Mr. Peterson allegedly stated "if the Judge decides I should stay, I will stay." Assuming that he did not overstate Mr. Peterson's position and that Mr. Peterson was quoted in appropriate context, the television audience of the Washington, D.C. metropolitan area should anticipate his timely reappearance as news anchorman for station WDVM–TV. Of course, the avenue of appeal is always available.

An order consistent with this Memorandum Opinion will be entered. Counsel for the plaintiff shall submit immediately an appropriate order.